**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FRATERNAL ORDER OF POLICE PENNSYLVANIA LODGE**, et al., | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 23-332-KSM** |
| **TOWNSHIP OF SPRINGFIELD**, et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                                       **April 6, 2023**

On January 27, 2023, Plaintiffs Fraternal Order of Police Pennsylvania Lodge ("PA

FOP"), Springfield Township Police Benevolent Association ("PBA"), Officer Christian Wilbur,

Officer Robert Baiada, and Officer Chris Calhoun (collectively, "Plaintiffs") filed a Complaint

against Defendants the Township of Springfield, seven members of the Township Board of

Commissioners in their official capacity, and the Township manager in his official capacity

(collectively, the "Township").  (Doc. No. 1.)  Plaintiffs argue that Township Resolution No.

1592, "A Resolution Prohibiting the Display of the Thin Blue Line American Flag on All

Township Property," is facially unconstitutional under the First and Fourteenth Amendments of

the United States Constitution, and they seek permanent injunctive relief barring its enforcement.

(*Id*.)

The Township seeks to depose representatives of the PBA and PA FOP (collectively, the

"Organizations") and ask about internal communications by and between members that discuss,

among other things, the PBA's decision to adopt the Thin Blue Line American Flag as part of its

logo, the PBA members' views on the Township's Board and Resolution 1592, and the

Organizations' reasons for bringing this lawsuit.  (*See* Doc. Nos. 25-1, 25-2.)  The Organizations

move for a protective order forbidding the Township from asking questions about these topics.

(Doc. No. 25.)  For the reasons discussed below, the motion for protective order is, in part,

granted and, in part, denied as moot.

## I.      FACTUAL BACKGROUND

Viewing the allegations in the Complaint as true, the relevant facts are as follows.

### A.      The Thin Blue Line American Flag

This controversy centers around what the Court will refer to as the "Thin Blue Line

American Flag," an American flag that is in black and white except for a single blue horizontal

stripe:



For Plaintiffs, the flag "has come to represent a show of support for and solidarity with

members of law enforcement."  (Doc. No. 1 at ¶ 18; *see also id.* at ¶¶ 20, 22 (stating that the

Organizations view the flag as representative of "the preservation of the rule of law, the

protection of peace and freedom, the sacrifice of fallen law enforcement officers, and the

dedication of law enforcement officers").)  At a national level, the Fraternal Order of Police has

passed a resolution that affirms its "support for the use of the Thin Blue Line [American] flag by

law enforcement," and at a local level, individual members of the PA FOP have been known to

wear pins, buttons, and clothing depicting the flag, and to put bumper stickers of the flag on their

cars.  (*Id.* at ¶¶ 19, 21; *see also id.* at ¶ 26 (alleging that individual members of the PBA similarly

display the flag on clothing and bumper stickers and "[m]any members . . . wear a rubber replacement wedding ring that displays and depicts the Thin Blue Line [American] flag").) Likewise, the PBA has incorporated the Thin Blue Line American Flag into its logo:



This logo appears on the PBA's website, its merchandise, and at fundraisers and events hosted by the PBA, some of which take place on Township property. (*Id.* at ¶¶ 24–25, 28.) Finally, the three individual Plaintiffs—Officers Calhoun, Baiada, and Wilbur (collectively, the "Officer Plaintiffs")—are officers with the Township Police Department and members of the Organizations. (*Id.* at ¶¶ 3–5.) Each Officer Plaintiff "depicts and displays the Thin Blue Line [American] flag on his personal property" while on and off duty, and they wish to continue doing so. (*Id.* at ¶¶ 30–44.) The Officer Plaintiffs also allege that "members of the public" recognize them as police officers with the Township. (*Id.* at ¶¶ 34, 39, 44.)

While Plaintiffs revere the Thin Blue Line American Flag, many members of the public, including residents of Springfield Township, view it as a symbol of police brutality and racial animosity. (Doc. No. 1-5 at 1.) On October 26, 2022, Township Solicitor James Garrity, and Township Manager A. Michael Taylor, sent a cease-and-desist letter to the PBA about their use of the flag. (Doc. No. 1 at ¶ 45; *see also* Doc. No. 1-3.) In that letter, Mr. Garrity and Mr. Taylor explain that many Township residents had "express[ed] deep discontent and distrust of the PBA and even the Township's own police department, due to PBA's use of the flag which has become known as the 'Blue Lives Matter Flag.'" (Doc. No. 1-3 at 1.) They emphasize that

the flag "has been at the center of the controversy between minority communities and law enforcement officials across the country," citing the "usurpation and display" of the flag by white nationalists.  (*Id.*)  Thus, they reason, "regardless of the history or original intent of the PBA in displaying" the flag, "[t]o many members of the Springfield Township community, the utilization of the [Thin Blue Line American] Flag unnecessarily exacerbates the ongoing conflict between police officers and the communities they serve."  (*Id.* at 2–3.)  The letter ends by directing the PBA to either discontinue all depictions of the flag or remove the words "Springfield Township" from the name of the PBA.  (*Id.* at 2.)

### B.   Resolution 1592

When the PBA refused to change its logo or its name, the Springfield Township Board of Commissioners drafted Resolution 1592:

> [T]he Board of Commissioners of Springfield Township does, as a matter of respect and sensitivity to all the citizens of the Township, hereby prohibit the publicly visible display or use of any image which depicts the Thin Blue Line American Flag symbol by any Township employee, agent, or consultant and in an effort to be clear and as reasonably limited as possible, specifically prohibits the following:
>
> > 1)  The publicly visible depiction of the symbol on the clothing or skin of any Township employee, agent or consultant while on duty, during the workday of the individual or while representing the Township in any way (specifically including the off duty time of any such individual if still wearing the Township uniform).
> >
> > 2)  The publicly visible depiction of the Thin Blue Line American [F]lag symbol on any personal property of a [T]ownship employee, agent, or consultant, which is brought into the [T]ownship building (except prior to or subsequent to reporting for duty or any official assignment for the Township), and which, in the reasonable opinion of the Township Manager, is placed in a location likely to be seen by a member of the public while visiting the [T]ownship building.

> 3)  The display, by installation or affixation of a publicly visible depiction of the symbol, on [T]ownship owned property (including [T]ownship vehicles), by any person.

(Doc. No. 1-5 at 1–2.)

In addition, the Resolution includes six "whereas" clauses that outline the Board's justification for passing the Resolution.  (*See* Doc. No. 1-5 at 1.)  These clauses briefly describe the history of the "Thin Blue Line" flag, which began as a "black field with a single, narrow blue line" and developed into the Thin Blue Line American Flag.  (*Id.*)  Although the Thin Blue Line American Flag was "created as a sign of support for law enforcement officers, . . . over time, and partially in negative response to the 'Black Lives Matter' flag, the Thin Blue Line American Flag has also come to represent opposition to racial justice movements . . . and in some instances has become a symbol of white supremacy."  (*Id.*)  Given this history, and following "public comment from many Springfield Township . . . residents" who stated that continued use of the flag "appears to express support for the systemic oppression of certain members of the Township community," the Board concluded that the "publicly visible display of the Thin Blue Line American Flag symbol . . . is contrary to the core values of the Township, and impedes efforts to build trust among all citizens in the policing services provided by the Township through its well-respected Police Department."  (*Id.*)

The Resolution was placed on the agenda of the December 14, 2022 meeting of the Board of Commissioners, and ultimately adopted on January 11, 2023.  (Doc. Nos. 1-4, 1-5; *see also* https://www.springfieldmontco.org/government/board-of-commissioners/commissioner-agendas-minutes/ ("Video of Jan. 11 Bd. Meeting").)  During the meeting on January 11, the Board discussed the history of the Township's discussions about the flag and opened the floor to public comment about the Resolution.  (Video of Jan. 11 Bd. Meeting at 00:02.48–3:57.26.)  Five days later, Mr. Taylor circulated a Memorandum to all Township employees about Resolution 1592,

emphasizing that the Resolution was "effective immediately."  (Doc. No. 1-6.)

### C.    Procedural History

On January 27, 2023, a little over two weeks after the Board adopted Resolution 1592, Plaintiffs filed this action pursuant to 42 U.S.C. § 1983, alleging that the Resolution violates the First and Fourteenth Amendments on its face because it is unconstitutional viewpoint discrimination, overbroad, and vague.  (*See* Doc. No. 1 at ¶¶ 70, 76, 81.)  Plaintiffs simultaneously moved for a temporary restraining order ("TRO") and preliminary injunction. (Doc. No. 2.)  The Court held a telephone conference with counsel for Plaintiffs and Mr. Garrity to discuss the motion.  (*See* Doc. No. 4.)  During that conference, Mr. Garrity represented that the Township would not enforce the Resolution pending the Court's ruling on the motion for preliminary injunction.  Given this representation, which eliminated the risk of imminent injury to Plaintiffs, the Court denied Plaintiffs' request for a TRO.  (Doc. No. 5.)  The Court simultaneously scheduled an evidentiary hearing and oral argument on the request for preliminary injunction.  (*Id.*)

Before that argument occurred, the parties stipulated that the Township would continue to refrain from enforcing Resolution 1592 while the parties pursue discovery.  (Doc. No. 8.) Accordingly, the Court denied the motion for preliminary injunction as moot and entered a Scheduling Order, which included dates for discovery, dispositive motions, and oral argument on the constitutionality of Resolution 1592 and the appropriateness of a declaratory judgment and permanent injunction.  (*See* Doc. No. 21.)

Not long after beginning discovery, the Township moved to dismiss the Organizations from the lawsuit under Federal Rule of Civil Procedure 12(b)(1) for lack of standing and to dismiss the Officer Plaintiffs' claims under Rule 12(b)(6) for failure to state a claim.  (Doc. No. 22.)  Among other things, the Township argues that striking down the Resolution would impinge

its First Amendment right to control its messaging and be free from compelled speech.  (*Id.* at 22–26; *see also id.* at 24 ("The Resolution prohibits the use of a non-public forum owned and controlled by the Township from being used to present a message that the Township finds objectionable.  To require the Township to allow the public display of the flag on Township property would send the message that the Township approves of and condones a message which violates the stated policy of the Township.  This would, in effect, serve to compel speech by the Township that it has declared to be contrary to its stated policy.").)  Plaintiffs vehemently oppose the motion to dismiss.  (Doc. No. 23.)  The motion remains under advisement.

In the meantime, the parties have pursued discovery.  To that end, the Township served deposition notices for the corporate designees of the PBA and PA FOP under Federal Rule of Civil Procedure 30(b)(6).  (*See* Doc. No. 25-1 (Notice to PBA); Doc. No. 25-2 (Notice to PA FOP).)  Each notice includes a list of topics about which the designees should be knowledgeable.  (Doc. No. 25-1 (identifying 16 topics); Doc No. 25-2 (identifying 13 topics).)  The Organizations filed a motion for protective order, challenging five of the topics identified for the PBA's designee and four of the topics identified for the PA FOP's designee.  (*See* Doc. No. 25 (challenging topics 3, 5, 8, 11, and 12 on the notice to the PBA and topics 4, 6, 8, and 10 on the notice to the PA FOP).)  The Township filed an opposition brief (*see* Doc. No. 26), and the Court held telephone status conferences on March 24 and 28, 2023.  The Court also held oral argument on April 3, 2023, during which the Township agreed to withdraw one topic identified in the PBA's notice and the parties were able to resolve all the topics identified in the PA FOP's notice.  (*See* Oral Arg. Rough Tr. at 20:2–11, 21:12–18, 24:14–22 (defense counsel withdrawing topic 11 in the PBA's notice and topics 4 and 8 from the PA FOP's notice); *id.* at 21:19–23:6 (Plaintiffs' counsel objecting to topic 10 of the PA FOP's notice only to the extent it involved internal

communications and deliberations and defense counsel clarifying that the topic does not seek either); *id.* at 20:12–21:11, 62:1–8 (the Court directing the parties to confer about the scope of topic 6 from the PA FOP notice).[1])  Accordingly, the motion for protective order is denied as moot as to these topics.

At the Court's request, Plaintiffs filed a reply brief (Doc. No. 28), and each party submitted a supplemental brief on whether the Supreme Court's analysis in *Pickering v. Board of Education* governs this action (*see* Doc. Nos. 30, 31).

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26 broadly governs the scope and timing of discovery. *See* Fed. R. Civ. P. 26(b).  Under that Rule, parties to a litigation "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see also id.* ("Information within this scope of discovery need not be admissible in evidence to be discoverable.").  In analyzing the proportionality of the requests, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Id.*  The Court "must limit the frequency or extent of discovery otherwise allowed" if it determines that the "proposed discovery is outside the scope permitted by Rule 26(b)(1)."  Fed. R. Civ. P. 26(b)(2)(C)(iii). Likewise, the Court must limit discovery that "is unreasonably cumulative or duplicative"; "can be obtained from some other source that is more convenient, less burdensome, or less

---

[1] After conferring, the parties informed the Court that they had reached an agreement as to topic 6.

expensive"; or when "the party seeking discovery has had ample opportunity to obtain the

information by discovery in the action" and has failed to do so.  Fed. R. Civ. P. 26(b)(2)(C)(i)–

(ii).

In addition to the limitations mandated by Rule 26(b)(2)(C), the Court retains "significant

discretion when resolving discovery disputes." *Reif v. CNA*, 248 F.R.D. 448, 451 (E.D. Pa.

2008).  And the Court "may for good cause, issue an order to protect a party or person from

annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1).

Because the PBA seeks the protective order, it "bears the burden of establishing that good cause

exists" for its entry. *Knaupf v. Unite Here Local 100*, Civil Action No. 14-6915 (PGS) (DEA),

2015 WL 7451190, at *4 (D.N.J. Nov. 23, 2015).

## III.    DISCUSSION

The PBA seeks a protective order forbidding the Township from asking the PBA's

representative about four topics identified in its deposition notice:

> 3)    Communications by and between the members of the [PBA] regarding the adoption or incorporation of the 'Thin Blue Line American Flag' into any logo, letterhead, promotional material, or insignia for the [PBA];
>
> . . . .
>
> 5)    The basis for the decision to incorporate the 'Thin Blue Line American Flag' into any logo, letterhead, promotional material, or insignia for the [PBA];
>
> . . . .
>
> 8)    Communications by and between the members of the [PBA] referring to, relating to, or regarding the enactment of Resolution 1592;
>
> . . . .
>
> 12)    Communications between members of the [PBA] and any member or representative of the [PA FOP] referring to,

> relating to, or regarding the decision to commence a lawsuit
> against Springfield Township relating to Resolution 1592[.]

(Doc. No. 25-1 at 2–3.)

The PBA argues that none of these topics seek relevant information, that the information sought is not proportional to the needs of the case, and that to the extent the requests seek internal communications between members of the PBA (i.e., topics 3, 5, and 8), that information is protected by a qualified associational privilege and cannot be compelled unless highly relevant to the claims or defenses in the litigation. (*See generally* Doc. Nos. 25, 28.) The PBA has also submitted four sworn declarations by individual officers, each of which describes the officer's membership in the Organizations and his concerns that turning over his and other members' internal communications will limit the freedom with which members deliberate in the future. (*See* Doc. Nos. 28-2, 28-3, 28-4, 33.)

The Township opposes the motion for protective order, arguing that the challenged topics in the PBA's deposition notice seek relevant information and that the associational privilege does not apply. (*See generally* Doc. No. 26.) The Township also argues that the information sought is necessary to test the veracity of the allegations in the Complaint and that it is relevant to the "*Pickering* balancing test" that the Court will apply at summary judgment. (*See* Doc. No. 30 at 3.)

### A.     Associational Privilege

The Court begins with the associational privilege and analyzes whether it applies to PBA members' internal communications and deliberations about the decision to adopt the Thin Blue Line American Flag into its logo and about Resolution 1592—the information identified in topics 3, 5,[2] and 8 of the PBA's notice.

---

[2] The PBA objects to topic 5 on privilege grounds only to the extent it calls for disclosure of the

10

1.     **Legal Standard**

The First Amendment includes a right to associate.  *See In re Asbestos Sch. Litig.*, 46

F.3d 1284, 1294 (3d Cir. 1994) ("Joining organizations that participate in public debate, making

contributions to them, and attending their meetings are activities that enjoy substantial First

Amendment protection."); *In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d 470, 489–90

(10th Cir. 2011) (describing associational rights as including "lobbying efforts, ability to

communicate among themselves regarding legislative policy, or maintenance of members within

trade associations").  "Two types of association are protected by the federal Constitution:

intimate association (i.e., certain close and intimate human relationships like family

relationships) and expressive association (i.e., association for the purpose of engaging in

activities protected by the First Amendment)."  *Pi Lambda Phi Fraternity, Inc. v. Univ. of*

*Pittsburgh*, 229 F.3d 435, 438 (3d Cir. 2000).  When state action directly affects a group's

expressive associational activities, the state must "show a compelling interest that justifie[s] the

level of the burden imposed on the groups' expression."  *Id.*  Discovery requests represent "state

action" that may impermissibly affect an organization's associational activities.  *See In re Motor*

*Fuel Temp. Sales Practices Litig.*, 641 F.3d at 488; *Perry v. Schwarzenegger*, 591 F.3d 1126,

1140 (9th Cir. 2009); *see also v NAACP v. Alabama*, 357 U.S. 449, 462 (1958) ("It is hardly a

novel perception that compelled disclosure of affiliation with groups engaged in advocacy may

constitute . . . a restraint on freedom of association . . . .").

The party asserting an associational privilege to discovery "has the burden of proving

[the privilege's] existence and applicability.'"  *Knaupf*, 2015 WL 7451190, at *5 (quoting *In re*

*Grand Jury Investigation*, 918 F.2d 374, 385 n.15 (3d Cir. 1990)); *see also In re Motor Fuel*

---

organization's internal communications and deliberations.  (*See* Oral Arg. Rough Tr. at 17:14–17.)

*Temp. Sales Practices Litig.*, 641 F.3d at 488 ("[W]e have generally held that the party claiming a privilege always bears the initial burden of establishing the factual predicate for privilege.  We are not persuaded that this traditional allocation of burdens should be dispensed with simply because the claimed privilege implicates the First Amendment and the appellants' right of association.") (citations omitted); *Perry*, 591 F.3d at 1140 ("A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment *privilege*.").

In the context of the associational privilege, that means the party opposing discovery must show "that enforcement of the discovery request will result in consequences which objectively suggest a 'chilling' impact on associational rights."  *Knaupf*, 2015 WL 7451190, at *5 (citing *Perry*, 591 F.3d at 1140).  "This *prima facie* showing requires appellants to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights."  *Perry*, 591 F.3d at 1140 (cleaned up); *see also In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d at 489 ("[T]he First Amendment privilege at issue in this case generally ensures privacy in association when exposure of that association will make it less likely that association will occur in the future, or when exposure will make it more difficult for members of an association to foster their beliefs.  These are the 'chilling effects,' or consequences of disclosure, that the First Amendment privilege seeks to avoid.").

If the prima facie showing is made, the burden shifts to the government to show it "has a sufficiently compelling need for the information that outweighs the other party's interest in keeping it private."  *In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d at 492 n.15; *see also*

*Perry*, 591 F.3d at 1140 (explaining that the government must "demonstrate that the information sought through the discovery is related to a compelling governmental interest and the least restrictive means of the desired information") (cleaned up); *United States v. Citizens State Bank*, 612 F.2d 1091, 1094 (8th Cir. 1980) ("The appellants met their initial burden by making a prima facie showing of arguable First Amendment infringement; the burden then shifted to the government to make the appropriate showing of need for the material.").  At this second step, the question is whether the government has "demonstrated an interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the freedom of the constitutionally protected right of association."  *Perry*, 591 F.3d at 1140 (cleaned up).  "Importantly, the party seeking the discovery must show that the information sought is *highly relevant* to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)."  *Id*. (emphasis added)

      2.   **<u>Analysis</u>**

          a.    *Prima Facie Case*

The PBA argues that if it is required to disclose member communications about adopting the Thin Blue Line American Flag and Resolution 1592, the disclosure will chill members' exercise of their associational rights.  (Doc. No. 28 at 3–4.)  In support of that position, the PBA submits the declarations of four members of the Springfield Township Police Department, who are also members of the PBA:  Plaintiff Officer Christian Wilbur (Doc. No. 33), Plaintiff Officer Chris Calhoun (Doc. No. 28-2), Plaintiff Officer Robert Baiada (Doc. No. 28-3), and Officer Joseph Regan (Doc. No. 28-4).  The officers explain that they often communicated with other members of the PBA about the decision to adopt the flag as part of the PBA's logo, their political beliefs about the flag, and the best strategy for responding (legal and otherwise) to Resolution 1592.  (*See* Wilbur Decl. ¶¶ 7–9; Calhoun Decl. ¶¶ 5–7; Baida Decl. ¶¶ 5–7; Regan Decl. ¶¶ 9–

13.)  They attest that if they are forced to produce these communications, they "will be less willing to engage in communications" in the future for fear that their "private thoughts on how to petition the government and [their] private political and moral views may be disclosed."  (*See* Wilbur Decl. ¶ 11; Calhoun Decl. ¶ 9; Baiada Decl. ¶ 9; Regan Decl. ¶ 12.)  Similarly, Officer Wilbur, who is president of the PBA, states that disclosure of these communications is likely to chill the internal deliberations and participation of other members for fear that those deliberations will be open to public inspection.  (Wilbur Decl. ¶ 12.)  Finally, Officers Wilbur, Calhoun, and Baiada attest that former Township Board Member Eddie Graham has publicly compared the PBA's members to individuals who fly the Confederate flag and flags with swastikas.  (Wilbur Decl. ¶¶ 13–15; Calhoun Decl. ¶¶ 11–14; Baiada Decl. ¶¶ 11–14.)  Given this past conduct, the Officer Plaintiffs fear that their private communications on the issues at stake in this litigation will result in further negative publicity and harm to their reputations. (Wilbur Decl. ¶ 16; Calhoun Decl. ¶ 14; Baiada Decl. ¶ 14.)[3]

These declarations give rise to a "reasonable inference" that disclosure of members' internal communications will discourage them from freely exchanging ideas with other members in the future, and thus, infringe up on those members' associational rights.  *See In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d at 490 ("[A]ppellants purported to present evidence that disclosure of the requested information would discourage membership in the trade associations

---

[3] According to defense counsel, Mr. Graham ceased being a member of the Board in March 2023 (*see* Oral Arg. Rough Tr. at 35:15–23), and therefore, the Officer Plaintiffs cannot objectively fear that their internal communications will appear in the press and be used against them.  However, if any of the communications are made publicly available through this lawsuit, Mr. Graham, and *every other member* of the public, would have access to them.  Although the Township offered to enter a discovery confidentiality agreement in connection with the communications, it maintains that these communications are relevant to its defenses.  (*Id.* at 52:23–53:8.)  If true, the communications will enter the public domain at later stages of this litigation and the Officer Plaintiffs concerns that communications will be used against the members of the PBA are legitimate.

and stifle full and frank discussions within and among the trade associations—a type of chill which, if properly supported by evidence, would satisfy the appellants' prima facie burden."); *Perry*, 591 F.3d at 1143 (finding a similar declaration created "a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal campaign communications that are essential to effective association and expression"); *Am. Fed. of Labor & Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168, 176–77 (D.C. Cir. 2003) (considering affidavits that "charge that disclosing detailed descriptions of training programs, member mobilization campaigns, polling data, and state-by-state strategies will directly frustrate the organizations' ability to pursue their political goals by effectively revealing to their opponents activities, strategies, and tactics that [they] have pursued in subsequent elections and will likely follow in the future," and finding that the organizations "asserted substantial First Amendment interests in the disclosure of their own internal materials") (quotation marks omitted); *Dole v. Service Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1460 (9th Cir. 1991) (considering the declarations of two union members who said that they "no longer feel free to express their views on controversial issues at union meetings" because the trial court ordered production of the meeting minutes, and finding that this "is precisely the sort of 'chilling' of first amendment rights" that "serves to establish a *prima facie* case"); *In re First Nat'l Bank*, 701 F.2d 115, 116–17 (10th Cir. 1983) (relying on "[a]ffidavits submitted to the district court" that "describe harassment and intimidation of petitioners' known members, and the resulting reluctance of people sympathetic to the goals of [the organization] to associate with the group for fear of reprisals.").[4]

---

[4] The Township argues that the Court should not rely on the declarations because they "lack credibility" and none of the officers have been subjected to cross examination. (Oral Arg. Rough Tr. at 35:10–36:17.) But as the cited cases show, the PBA can satisfy its prima facie burden by submitting declarations made under oath by affected members. The Township has cited no case law that suggests

The Township argues that the PBA cannot satisfy its prima facie burden because the associational privilege is limited to disclosure of the identities of an organization's members and does not extend to member communications.  (*See* Doc. No. 26 at 5–8.)  The Township would have the Court adopt a narrow reading of the Supreme Court's opinion in *NAACP v. Alabama*, which involved the disclosure of an organization's membership lists.  357 U.S. at 462–63.  But such a reading is inconsistent with nearly every opinion to interpret *NAACP*, including many of the cases cited in the previous paragraph.  Although the Third Circuit has not spoken directly on the issue, courts from other Circuits and district courts in this Circuit have found that the associational privilege extends beyond membership lists, and at least one Circuit Court has held that the privilege can extend to an organization's internal deliberations and communications.  *See, e.g.*, *Perry*, 591 F.3d at 1141 ("The existence of a prima facie case turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities.  We have little difficulty concluding that disclosure of internal campaign communications *can* have such an effect on the exercise of protected activities."); *Knaupf*, 2015 WL 7451190, at *5 ("The First Amendment privilege has been applied by various courts in various contexts, including contexts other than membership lists . . . .") (citing *DeGregory v. Atty Gen. of N.H.*, 383 U.S. 825 (1966)); *Glass v. Snellbaker*, Civil Action No. 05–1971(JBS), 2007 WL 1723472, at *5 (D.N.J. June 14, 2007) ("Plaintiff's conversations with union officials, in connection with their attempts to petition for change and talk with one another as well as the Chief about avenues for change, is protected conduct under the First Amendment.  In his conversations with the union, Plaintiff was not acting pursuant to his official duties to the Department, but as an associate of the union . . . ."); *cf. DeGregory*, 383

---

something more is required at this stage, nor does the Court find the declarations "lack credibility."

U.S. at 827–30 & n.4 (finding New Hampshire's interest was too remote to override the appellant's First Amendment interests and that appellant was justified in refusing to answer questions concerning his relationship with the Communist parties before 1957, including questions about attendance at Communist Party meetings and discussions during those meetings); *In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d at 489–90 (describing associational rights as including "lobbying efforts, *ability to communicate among themselves* regarding legislative policy, or maintenance of members within trade associations") (emphasis added).

The Township also argues that the communications are not subject to the associational privilege because they "are not related to" the PBA's "internal strategy or campaign." (Doc. No. 26 at 9.) The Court disagrees. The Township seeks internal communications about the PBA's decision to adopt the Thin Blue Line American Flag into its logo and its decision to bring this lawsuit in defense of that position. These are highly divisive issues that go to the core of the members' rights to associate for purposes of advancing jointly held political beliefs. *See Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny*, 513 F. Supp. 3d 593, 612 (W.D. Pa. 2021) ("[T]here is no dispute that a ban on any type of political or social-protest speech strikes at the heart of the most valuable speech protected by the First Amendment. . . .). Indeed, the text of the Resolution describes the divisive and political nature of the flag. (*See* Doc. No. 1-5 (describing the flag as a symbol of "opposition to racial justice movements, including the Black Lives Matter cause").)[5]

---

[5] For similar reasons, the Court rejects the Township's suggestion that if the associational privilege applies in this case, it will be used in the future to foreclose disclosure of any communication that any member of any organization has with any other member about any issue. (Oral Arg. Rough Tr. at 36:18–37:4 (incorrectly framing Plaintiffs' argument as asserting that "the associational privilege . . . protects against the disclosure of any and all communications between members").) Here, the Township seeks internal communications and deliberations about the PBA's stance on a divisive, political topic, and

In sum, the PBA has satisfied its prima facie burden of showing that disclosure of communications between members about the decision to adopt the Thin Blue Line American Flag and to oppose Resolution 1592, could have a chilling effect on the exercise of those members' associational rights.  Accordingly, the burden shifts to the Township to show that these communications have a "substantial bearing" on the issues in this litigation.  *NAACP*, 357 U.S. at 464.

> b.      *Substantial Bearing*

To determine whether the government can satisfy its burden, courts consider, among other things, whether the information sought is "highly relevant to the claims or defenses in the litigation," whether the requests are "carefully tailored to avoid unnecessary interference with protected activities," and whether the information sought is available through other channels. *Perry*, 591 F.3d at 1140–41.

The Township argues that the requested communications are highly relevant to the claims and defenses in this case, which will involve "competing First Amendment interests which must be balanced."  (Doc. No. 26 at 11–12.)  In its supplemental letter brief,[6] the Township specifically references the "*Pickering* balancing test" and argues that the information sought is necessary for the Court to perform that test.  (Doc. No. 30 at 3.)  The PBA counters that because this is a pre-enforcement, facial challenge to the Resolution, the Supreme Court's opinion in

---

the Court's holding rests both on the internal nature of the communications and their subject matter.  Moreover, the associational privilege does not foreclose all discovery on these communications.  Instead, it alters the Township's burden, so that it must show the communications are "highly relevant" before they will be disclosed.

[6] The Township spends most of its supplemental letter brief arguing that Resolution 1592 is unenforceable against members of the public, and thus, "neither the Springfield PBA nor the PA FOP can logically assert any actual risk of impending injury from the Township's statement of policy."  (Doc. No. 30 at 2.)  The Court addresses this issue in its forthcoming Memorandum on the Township's motion to dismiss.

*United States v. National Treasurers Employees Union ("NTEU")*, not *Pickering*, controls, and under *NTEU*, the communications will be of little to no relevance, let alone highly relevant. (Doc. Nos. 28, 31.)  As the parties back-and-forth suggests, this case will involve multiple First Amendment considerations.  A closer look at those considerations, however, shows that none of the communications sought by the Township are "highly relevant" to the Court's analyses.

Resolution 1592 includes three prohibitions, two of which limit the ability of Township employees, agents, and consultants, both on and off duty, to display the Thin Blue Line American Flag, and one of which prohibits all members of the public from installing or affixing the flag to Township property:

> 1)  The publicly visible depiction of the symbol on the clothing or skin of any Township employee, agent or consultant while on duty, during the workday of the individual or while representing the Township in any way (specifically including the off duty time of any such individual if still wearing the Township uniform).
>
> 2)  The publicly visible depiction of the Thin Blue Line American [F]lag symbol on any personal property of a [T]ownship employee, agent, or consultant, which is brought into the [T]ownship building (except prior to or subsequent to reporting for duty or any official assignment for the Township), and which, in the reasonable opinion of the Township Manager, is placed in a location likely to be seen by a member of the public while visiting the [T]ownship building.
>
> 3)  The display, by installation or affixation of a publicly visible depiction of the symbol, on [T]ownship owned property (including [T]ownship vehicles), by any person.

(Doc. No. 1-5 at 1–2.)  At least five Constitutional tests are potentially relevant to deciding Plaintiffs' challenge to these provisions:  the test for government speech, the test for restrictions on public employee speech, the prohibition on viewpoint discrimination, the overbreadth doctrine, and the void for vagueness doctrine.  The Court briefly outlines the parameters of each

test to determine whether the challenged discovery requests seek information that is "highly relevant" in this action.

### i.    Government Speech

The first test the Court is likely to consider in this action is whether the Resolution limits government, as opposed to private, speech.  (*See* Doc. No. 22 at 22–26.)

"The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  Put simply, a "government entity has the right to 'speak for itself'" and to "to select the views that it wants to express."  *Id.*; *see also Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says.").  This doctrine "reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech," and for that reason, "government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas."  *Walker*, 576 U.S. at 207 (citations omitted).

For example, courts have held that a government speaks for itself when it chooses which permanent monuments to display in a public park, *Pleasant Grove City*, 555 U.S. at 470, and which designs to display on specialty license plates, *Walker*, 576 U.S. at 208.  Courts have also found that the government can speak through its employees or representatives when it is the job of those representatives to speak on behalf of the government.  *See Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 103 (3rd Cir. 2022) ("If an employee's job is to speak, the First Amendment does not prevent a government employer from controlling the speech for which the employee is employed.").  For example, the Eleventh Circuit in *Dean v. Warren* found that a student "engaged in government speech when she cheered in a team

uniform at a football game on behalf of her public university," and therefore, the university "did not violate her First Amendment rights when it prevented her from kneeling on the field" during the National Anthem.  12 F.4th 1248, 1265 (11th Cir. 2021).  Similarly, at least one district court has found that the "curricular speech of primary and secondary school teachers" is government speech that can be regulated by the state without infringing on the teacher's rights.  *See Local 8027, AFT-N.J., AFL-CIO v. Edelblut*, Case No. 21-cv-1077-PB, 2023 WL 171392, at *4–7 (D.N.H. Jan. 12, 2023).

That said, "not all speech by a government agent is 'government speech' subject to such a lenient analysis; indeed, even when a government agent represents that he is speaking as a representative of the government body, that agent may have independent rights under the First Amendment."  *Latino Officers Ass'n, N.Y., Inc. v. N.Y.C.*, 196 F.3d 458, 468 (2d Cir. 1999); *cf. Walker*, 576 U.S. at 208 ("That is not to say that a government's ability to express itself is without restriction . . . .  [T]he Free Speech Clause itself may constrain a government's speech if, for example, the government seeks to compel private persons to convey the government's speech.").

"The line between a forum for private expression and the government's own speech is important, but not always clear."  *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1587 (2022). When navigating this grey area, the court considers "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression."  *Id.*; *see also Walker*, 576 U.S. at 210–14 (holding that specialty license plate designs were government speech because (1) license plates "long have communicated messages from the States"; (2) "license plate designs are often closely identified in the public mind with the State"; and (3) "Texas

maintains direct control over the messages conveyed on its specialty plates").

With the contours of the government speech test in mind, the Court turns to the parties' discovery dispute.  In this case, the Court will determine whether Resolution 1592 regulates government speech by considering, among other things, the extent to which the Township has previously regulated its employees' ability to display political and social-protest imagery while on duty, the extent to which the Township has forbidden the temporary placement of political and social-protest messaging on Township property in the past, and whether members of the community are likely to view the Township as the one speaking in either scenario.  The Court will not consider the sincerity of the individual employees and the public's stated reasons for wanting to display the Thin Blue Line American Flag.  *See Walker*, 576 U.S. at 210–14 (considering the history of the Government's regulation of license plates broadly, not the history of the confederate flag symbol that the plaintiffs sought to place on a specialty license plate); *Pleasant Grove City*, 555 U.S. at 464 (considering the government's history of placing permanent monuments in public parks, not the history of the specific religious monument that the plaintiffs wished to place in the park).

Accordingly, the requested discovery—communications between the PBA's members about the PBA's logo and Resolution 1592—is irrelevant to the Court's analysis on this issue.

### ii.        Employee Speech

The second First Amendment test that the Court is likely to consider in this action is the test for government regulation of public employee speech.  If the Court finds that some or all of Resolution 1592 is *not* government speech, the Court will then analyze whether the first two sections of the Resolution are proper restraints on the speech of the public employees who work for the Township.  Once again, the Court finds that member communications about the PBA's logo and Resolution 1592 will not have a "substantial bearing" on this determination.

The PBA argues that to the extent Resolution 1592 is not regulating government speech, it is impermissible viewpoint discrimination because it prohibits the display of the Thin Blue Line American Flag but not other political or social protest speech. *See, e.g.*, *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys. . . . Viewpoint discrimination is thus an egregious form of content discrimination. The government *must abstain* from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.") (emphasis added); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) ("St. Paul's brief asserts that a general 'fighting words' law would not meet the city's needs because only a content-specific measure can communicate to minority groups that the 'group hatred' aspect of such speech 'is not condoned by the majority.' The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content.") (citations omitted); *Amalgamated Transit Union Local 85*, 39 F.4th at 108–09 (analyzing the municipal agency's prohibition on face masks with political or social justice messaging and explaining that "viewpoint-based government regulations on speech are nearly always presumptively suspect" and the "more a public employer's policy looks like viewpoint discrimination—or is likely to foster such discrimination—the less likely it will be able to survive scrutiny under *Pickering-NTEU*"); *Ne. Pa. Freethought Society v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) ("[N]o matter what kind of property is at issue, viewpoint discrimination is out of bounds. . . . Rather than aiming at an entire subject, it targets particular views taken by speakers. And that violates the First Amendment's most basic promise."). The Township has not disputed that its regulation is a form of viewpoint discrimination. To the contrary, during oral argument,

defense counsel seemed to concede that Resolution 1592 was directed at what the Township

views as an "offensive symbol."  (*See, e.g.*, Oral Arg. Rough Tr. at 40:2–9, 45:7–46:14.)[7]

Defense counsel argues, however, that the Township is allowed to impose viewpoint regulations

on its employees, so long as the regulation can pass the balancing test outlined by the Supreme

Court in *Pickering*.  (*See* Oral Arg. Rough Tr. at 33:14–34:11; *see also* Doc. No. 30 at 3.)  The

PBA disagrees and argues that if the Court reaches a balancing test at all, it should apply the

modified-*Pickering* test described by the Supreme Court in *NTEU*.  (Doc. No. 31.)  *See* 513 U.S.

454, 468 (1995).  Because the Court agrees that of the two, *NTEU*, not *Pickering* governs the

Court's analysis, and that the requested discovery is irrelevant under the *NTEU* test, we need not,

in this discovery dispute, determine the contours of the Township's authority to regulate

employee speech based on viewpoint.

 "When a citizen enters government service, the citizen by necessity must accept certain

limitations on his or her freedom."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

Nevertheless, the Supreme Court has "made clear that public employees do not surrender all

their First Amendment rights by reason of their employment."  *Id.* at 417.  A public employer has

limited authority to regulate employee speech when "employees are speaking as citizens about

matters of public concern."  *Id.* at 419.  In such instances, the government may restrict speech

only to the extent necessary for it to "operate efficiently and effectively."  *Id.*  The Supreme

---

[7] Given defense counsel's repeated arguments on this front, the Court feels compelled to remind counsel that the First Amendment protects speech even when it is considered "offensive." *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.") (quotation marks omitted); *United States v. Eichman*, 496 U.S. 310, 319 (1990) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (quotation marks omitted).

Court first discussed this limitation in *Pickering v. Board of Education. See* 391 U.S. 563 (1968).

In *Pickering*, the local board of education dismissed a teacher after he submitted a letter to a local newspaper that was critical about the board's allocation of school funds between academic and athletic programs and about the board's reasons for seeking additional tax revenue. *Id.* at 569–70. In finding the teacher's dismissal improper, the Court held that "absent proof of false statements, knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574. To determine whether the dismissal passed constitutional muster, the Court weighed "(1) the interest of the employee, 'as a citizen, in commenting upon matters of public concern,' against (2) 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Amalgamated Transit Union Local 85*, 39 F.4th at 104 (quoting *Pickering*, 391 U.S. at 568).[8]

---

[8] Some courts have framed this test as requiring consideration of the "public value" of the employee's speech: "Under *Pickering* we are required to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 52 (1st Cir. 2003). The Supreme Court has also referenced the "value" of the speech in connection with the *Pickering* balancing test. *See Connick v. Myers*, 461 U.S. 138, 152 (1983) (explaining that when the court "weigh[s] the value of [the plaintiff's] speech," it considers the extent to which the type of speech is "entitled to . . . constitutional protection").

The Township, relying on this language, argues that because the Court must consider the "value" of the Thin Blue Line American Flag, it is relevant whether individual police officers sincerely wish to display the flag to show support for the police as opposed to displaying it as a sign of opposition to racial justice movements like Black Lives Matter. (*See* Oral Arg. Rough Tr. at 39:1–8 ("[U]nder the *Pickering* or *NTEU* balancing test, one of the things that has to be balanced is the public value of the speech at issue. And to the extent that what Plaintiffs are now trying to claim [that] the message that they are trying to express is, in fact, not the message that they were intending to send at the time[ i]t dramatically impacts what the public value is."); *id.* at 39:24–40:1 ("These discussions and communications go directly to what is the real message they are trying to send, and what is the public value of that message.").) This argument misunderstands the meaning of "public value" in this context. The public value of speech is determined by looking at the type of speech being regulated; for example, does the speech constitute political or social protest speech as opposed to speech on a private grievance. *See Connick*, 461 U.S. at

Almost 30 years after *Pickering*, the Supreme Court drew a distinction between pre-enforcement challenges to regulations of employee-speech and post-enforcement challenges after an employee is disciplined for a specific statement. *See NTEU*, 513 U.S. at 454–55 ("[B]ecause § 501(b) constitutes a wholesale deterrent to a broad category of expression by a massive number of potential speakers, the Government's burden here is even greater than it was in *Pickering* and its progeny, which usually involved individual disciplinary actions taken in response to particular government employees' actual speech."). When the government imposes a "statutory restriction on [employee] expression," it "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation' of the Government." *Id.* at 468.

The Township argues that *Pickering*, not *NTEU*, should govern this case. (*See* Doc. No. 30 at 3.) This is incorrect. Because this case involves a pre-enforcement challenge to employee speech, *NTEU* controls. *See Amalgamated Transit Union Local 85*, 39 F.4th at 104 (explaining

---

154 (performing the *Pickering* balancing test and finding that "Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships"); *id.* at 152 ("We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.").

Speech on a public issue, such as political and social-protest speech—like the Thin Blue Line American Flag—is of immense public *value*, regardless of whether the citizens in Springfield Township agrees with the viewpoint expressed. *See id.* at 145 ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."); *Amalgamated Transit Union Local 85*, 513 F. Supp. 3d at 612 ("As an initial matter, there is no dispute that a ban on *any type* of political or social-protest speech strikes at the heart of the *most valuable* speech protected by the First Amendment.") (emphases added). With this clarification in mind, the Thin Blue Line American Flag is likely of immense First Amendment "value" *regardless* of whether it is displayed to show support for the police or as a counter to the Black Lives Matter movement, because in either case, it is speaking to an issue of substantial public importance.

that "*NTEU* governs" a case involving "a policy that prohibited or restrained future speech," while *Pickering* governs when "discipline [is] imposed on employees after they ha[ve] engaged in certain speech"); *Swartzwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir. 2002) ("The present case differs from the typical *Pickering/Connick* case in that Order 53-7 restricts speech before it occurs, rather than penalizing employee speech after the fact.  In view of this feature of Order 53-7, we agree with the District Court that *United States v. National Treasury Employees Union (NTEU)* . . . is an instructive precedent."); *Latino Officers Ass'n*, 196 F.3d at 463 ("Application of the *NTEU* standard turns on whether a government employee's expression is restricted through a generally applicable statue or regulations, as opposed to a particularized disciplinary action."); *Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608, 619 (D. Ken. 2005) ("Because the dress code represents a broad deterrent on speech that prospectively restricts expression and thereby chills potential speech before it happens, the government must meet a heightened burden in justifying the policy.") (citing *NTEU*, 513 U.S. at 468).

Next, the Township argues that even if the Court applies *NTEU*, the balancing test remains the same, with the only difference being that the government's burden is heightened in the pre-enforcement contest.  (Oral Arg. Rough Tr. at 33:1–2.)  The Court agrees that the Township's burden is significantly higher when *NTEU* applies.  *See NTEU*, 513 U.S. at 468 (explaining, in the context of a pre-enforcement regulations, that the government's "burden is greater" than that described in *Pickering*); *see also Harman v. N.Y.C.*, 140 F.3d 111, 118 (2d Cir. 1998) (explaining that the government's "burden is particularly heavy where, as here, the issue is not an isolated disciplinary action taken in response to one employee's speech, but is, instead, a blanket policy designed to restrict expression by a large number of potential speakers."); *Amalgamated Transit Union Local 85*, 513 F. Supp. 3d at 610–11 ("[W]here a government

employer 'restricts employee speech before it occurs, rather than penalizing employee speech after the fact,' the Court applies the modified *Pickering* analysis described in *United States v. National Treasury Employees Union ('NTEU')*.") (quoting *Swartzwelder*, 297 F.3d at 235–36).

But the Court does not agree that the balancing test is the same under *NTEU* and *Pickering*.  *NTEU*, unlike *Pickering*, looks beyond the individual plaintiff to consider "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression."  *Amalgamated Transit Union Local 85*, 513 F. Supp. 3d at 610–11; *see also NTEU*, 513 U.S. at 468.  *Contra. Amalgamated Transit Union Local 85*, 39 F.4th at 104 (explaining that under *Pickering*, the court considers the specific employee's interest in the speech for which they were punished).  To the extent an individual plaintiff's views and experiences are relevant to this question, they are certainly less relevant than they would be under the *Pickering* test, which looks to the specific speech for which an individual plaintiff was disciplined.  *See Swartzwelder*, 297 F.3d at 238 (applying *NTEU* and considering the plaintiff's experience as "one example" of the "types of the opinion testimony that employees of the Bureau might give that would be of very substantial public concern," and then looking beyond that single experience to "[o]ther examples listed by the City itself"); *id.* at 240 ("Officer Swartzwelder's situation is illustrative"); *Draper*, 403 F. Supp. 2d at 619 (considering the plaintiff's desire to wear a cross pendant, along with other employees' potential desire to wear a "star of David, or some other minor, unobtrusive religious symbol on her person," in considering the constitutionality of the public library's dress code).

Moreover, to the extent a plaintiff's desired speech may be considered as one example of the interests affected by a challenged regulation, there is no reason to believe a court would need to delve into the sincerity of the message that the plaintiff wishes to convey.  Instead, courts

consider whether the speech is on an issue of public concern, the government's justification for restricting it, and the extent to which that restriction is narrowly tailored to address a real and identifiable harm.  *See e.g.*, *Amalgamated Transit Union Local 85*, 513 F. Supp. 3d at 613–14 ("What is missing . . . is any evidence of complaints from bus riders or the public about drivers wearing certain masks; conflict or violence between employees or members of the public; impediments to employees performing their work; decreased employee efficiency; or any other negative impact *in the workplace* attributable to employees wearing masks that feature political or social-protest messages."); *Draper*, 403 F. Supp. 2d at 619 ("Defendants have presented no evidence to move the library's concern from the speculative and hypothetical to the real and concrete.  Indeed, the evidence in this case indicates that Plaintiff's wearing of her cross was neither disruptive nor controversial until the library dress code made it a source of contention between Ms. Draper and Kompanik and Appling.  It is simply beyond credibility that an employee's personal display of a cross pendant, a star of David, or some other minor, unobtrusive religious symbol on her person would interfere with the library's purpose.").

Here, there can be no genuine dispute that the right to display the Thin Blue Line American Flag deals with a matter of public concern, regardless of whether it is used to show support of the police or as a protest to racial justice movements.  *See, e.g.*, *Amalgamated Transit Union Local 85*, 39 F.4th at 103–04 ("Port Authority's mask rules restrict speech on matters of public concern.  'Black Lives Matter,' 'Thin Blue Line,' and anti-mask-mandate masks all comment on matters of political or social concern to the community that are subjects of legitimate news interest.") (cleaned up).  Accordingly, the primary issues to be decided under this test are:  (1) the Township's justifications for restricting its employees' ability to display the flag, and (2) whether the Resolution is narrowly tailored to address that justification.  The

sincerity of the PBA's reasons for adopting that flag as part of its logo and its members' views on Resolution 1592 are not "highly relevant" to those issues.[9]

### iii.        Other First Amendment Concerns

Finally, the Court notes that multiple other areas of First Amendment jurisprudence are implicated in this action. As mentioned before, Plaintiffs argue that the Resolution is impermissible viewpoint discrimination. *See, e.g.*, *Rosenberger*, 515 U.S. at 828–29. They also argue that the Resolution is both overbroad and vague on its face. *See United States v. Stevens*, 559 U.S. 460, 473 (2010) ("[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.") (quotation marks omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). These issues turn on the Court's interpretation of the text of the Resolution, and members' views on the flag and the Resolution will have no bearing on the Court's analysis. *See, e.g.*, *Conroy v. Lacey Twp. Sch. Dist.*, Civil Action No. 19-9452 (MAS) (TJB), 2020 WL 528896, at *2 (D.N.J. Jan. 31, 2020) ("The Court must consider the text of a regulation to determine whether it is overbroad and vague."); *see also Stevens*, 559 U.S. at 474 ("[T]he first step in overbreadth analysis is to construe the challenged statute . . . .") (quotation marks omitted); *Hill v. Colorado*, 530 U.S. 703, 732 (2000) ("A statute can be impermissibly vague for

---

[9] As Plaintiffs' counsel noted during oral argument, the government cannot go looking for a justification after the fact. (*See* Oral Arg. Rough Tr. at 9:19–22 ("[W]hat the[ Township] did here was they passed a solution, and now they are searching for a problem."); *id.* at 14:3–6 ("They have passed a solution, they have said, we need to ban the thin blue line flag, and now they are asking for discovery to demonstrate workplace acrimony to sort of support it.").) If the Township knew, at the time it passed the Resolution, that its employees were using the flag to protest racial justice movements and that displaying the flag was causing substantial problems between the police and the Township's minority communities, then those facts may be relevant to the Court's balancing under *NTEU*. But it is largely irrelevant whether the Township discovers now, during discovery in litigation, that individual employees wish to display the flag as a sign of their opposition to Black Lives Matter.

either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.").  Accordingly, the Township also has not shown a "substantial need" for the requested discovery under these doctrines.

*     *     *

For the reasons discussed above, the Court finds that the PBA has made a prima facie showing that the associational privilege applies.  Because the Township has failed to show a "substantial need" for the requested information, the protective order is granted as to topics 3, 5, and 8 of the notice sent to the PBA.[10]

### B.     Proportionality

That leaves topic 12 in the notice to the PBA:

> 12)     Communications between members of the [PBA] and any member or representative of the [PA FOP] referring to, relating to, or regarding the decision to commence a lawsuit against Springfield Township relating to Resolution 1592

(Doc. No. 25-1 at 2–3.)  The PBA argues that this topic seeks irrelevant information and that the requests are not proportional to the needs of the case.

Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter

---

[10] The Township also argues that the requested communications are needed to test the veracity of the Plaintiffs' allegations in the Complaint, which alleges that the Organizations' support of the Thin Blue Line American Flag stems from a belief that the flag "represents the preservation of the rule of law, the protection of peace and freedom, and the sacrifice of fallen law enforcement officers and the dedication of law enforcement officers."  (Doc. No. 26 at 10–11.)  As stated previously, the Court finds it irrelevant whether the individual members sincerely believe that the flag represents support for the police.  The Court also emphasizes that there seems to be no dispute that the flag has symbolized *both* support for the police *and* opposition to racial justice movements.  (*See* Doc. No. 1-5 at 1 (The Township acknowledging in Resolution 1592 that the flag represents a "sign of support for law enforcement officers"); *see also* Oral Arg. Rough Tr. at 54:1–7 ("[The Resolution] says that the thin blue line flag was adopted as a support—a show of support for the law enforcement community.  Other people think it means something different.  There's two perspectives on it.").)

that is relevant to any party's claim or defense and proportional to the needs of the case."  To

determine whether a discovery request is proportional, the Court considers "the importance of

the issues at stake in the action, the amount in controversy, the parties' relative access to relevant

information, the parties' resources, the importance of the discovery in resolving the issues, and

whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R.

Civ. P. 26(b)(1).

The PBA argues that the requested discovery is not proportional to the needs of the case,

emphasizing the limited relevance of the requested information and the substantial burden to the

PBA of producing *every* communication that *every* member had with *any* member of the PA

FOP about the decision to commence this lawsuit.  (Doc. No. 28 at 8–9.)  The Court agrees.  The

PA FOP has 40,000 members (Regan Decl. ¶ 8), and the PBA has approximately 29 members

(*see* Oral Arg. Rough Tr. at 13:3–10).  The burden and expense to the PBA of collecting,

reviewing, and producing every communication by any member of the PBA with any member of

the PA FOP about this lawsuit, outweighs any benefit to that production because, as stated

above, the communications are of virtually no relevance in this case.  Notably, the discovery

requests are not limited to *official* communications or communications by the Officer

Defendants, each of whom is a member of the PBA and PA FOP.  Instead, the discovery request

asks about the private communications of *every* member, the majority of whom are not named in

this action, and the request seeks every "communication," which would encompass spoken

communications, personal emails, personal letters, and text messages.

Accordingly, in addition to being overbroad, these requests clearly raise concerns about

the privacy interests of the PBA's members, most of whom are not named parties in this action.

*Cf. Health Robotics, LLC v. Bennett*, Civil Action No. 09–cv–0627, 2009 WL 10687682, at *1

n.1 (E.D. Pa. Aug. 24, 2009) ("[B]ecause non-parties to litigation typically enjoy greater protection from discovery than the parties themselves, courts are more likely to impose restrictions on discovery requests directed at a third party. . . .  Notably, standards for non-party discovery require a stronger showing of relevance than for party discovery."); *Carroll v. Del. River Port Auth.*, Civil No. 13-2833 (JEI/AMD), 2015 WL 12819181, at *4 (D.N.J. Mar. 31, 2015) ("In the context of non-party information, courts must generally weigh the significant privacy interests at stake against the need for the information . . . .") (cleaned up); *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (explaining that a "more demanding variant of the proportionality analysis" applies when the court is considering the appropriateness of a "subpoena issued against a nonparty," because when "discovery is sought from nonparties . . . its scope must be limited even more").

As discussed above, the relevance of the requested information is minimal in this First Amendment case, which will largely turn on the meaning of the Resolution's text and the Township's reasons for passing the Resolution.  The Court finds the Township has failed to show that the minimal relevance of the requested communications outweighs the invasion of privacy that would occur if every member of the PBA was required to turn over every communication that they had with every member of PA FOP about the decision to engage in this litigation.[11]  *See Hightower v. Grp. 1 Auto., Inc.*, CIVIL ACTION NO. 15-1284, 2016 WL 3511720, at *2 (E.D. La. Apr. 27, 2016) ("The court must balance the interests of the parties in obtaining relevant discovery against the privacy interests of individual non-parties.  Plaintiff has not shown that he needs the personnel files of all witnesses or provided anything to enable the court to engage in

---

[11] As an aside, the Court notes that because every member of the PBA is also a member of the PA FOP, this topic also seems to touch on issues discussed above in connection with the associational privilege.

the required proportionality analysis or balancing of plaintiff's alleged discovery interest against the privacy rights of non-parties.") (citations omitted).  *Contra. Lee v. Aramark Facility Servs., LLC*, CIVIL ACTION NO. 20-2049, 2021 WL 6070448, at *6 (E.D. La. July 15, 2021) ("The requests seek relevant information and are proportional to the needs of the case.  Further, the limited nature of the requests unnecessarily avoids invading the privacy of nonparties.").

For those reasons, the Court finds that topic 12 of the PBA's notice are not proportional to the needs of the case.[12]

## IV.   CONCLUSION

The motion for protective order is granted as to topics 3, 5, 8, and 12 of the notice to the PBA.  It is denied as moot as to topic 11 in the notice to the PBA and topics 4, 6, 8, and 10 in the notice to the PA FOP.  An appropriate order follows.

---

[12] During oral argument, defense counsel stated that he sought communications between members of the PA FOP and members of the PBA about this lawsuit because he wants any agreements between the Organizations about who is paying for the attorneys' fees in this action.  (*See* Oral Arg. Rough Tr. at 51:14–23.)  As currently phrased, the request clearly goes beyond a request for agreements about attorneys' fees.