# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **PENNSYLVANIA STATE LODGE FRATERNAL ORDER OF POLICE**, et al., | **CIVIL ACTION** |
| Plaintiffs, | **NO. 23-332-KSM** |
| *v.* | |
| **TOWNSHIP OF SPRINGFIELD**, et al., | |
| Defendants. | |

## MEMORANDUM

**MARSTON, J.**                                                                    **November 13, 2023**

On January 27, 2023, Plaintiffs, Pennsylvania State Lodge Fraternal Order of Police ("PA FOP"), Springfield Township Police Benevolent Association ("PBA" and together with the PA FOP, the "Organizations"), Corporal Christopher Calhoun, Detective Robert Baiada, and Sergeant Christian Wilbur,[1] filed this lawsuit against Defendants, the Township of Springfield, seven members of the Township Board of Commissioners in their official capacity,[2] and the Township manager in his official capacity (collectively, the "Township").  (Doc. No. 1.)

---

[1] Although the Complaint refers to each of the individual Plaintiffs merely as an officer with the Springfield Township Police Department (*see* Doc. No. 1 at ¶¶ 3–5), each Plaintiff identified his current rank during discovery (*see* Doc. No. 50 at ¶¶ 2, 5, 8).  The Court refers to the individual Plaintiffs by their rank as identified.

[2] Defendants ask that former-Commissioner Eddie Graham be removed from the caption in this action because he no longer serves as a member of the Board of Commissioners and under Federal Rule of Civil Procedure 25(g), when as here "a public officer who is a party in an official capacity . . . ceases to hold office while an action is pending . . . [t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(g).  Plaintiffs do not dispute that Graham is no longer an appropriate party, but nevertheless argue that Defendants' request should be denied because any substitution is "automatic" and defense counsel has not identified the appropriate substitute.  (Doc. No. 47 at 16–17.)  During oral argument, the Court asked defense counsel who replaced Graham on the Board, and counsel did not know.  After oral argument, however, defense counsel emailed Chambers a status report identifying the appropriate substitute as Brendan May.  Accordingly, the Court grants the motion and substitutes Brendan May for Eddie Graham.

Plaintiffs seek a declaration that Township Resolution 1592, "A Resolution Prohibiting the Display of the Thin Blue Line American Flag on All Township Property," is facially unconstitutional under the First and Fourteenth Amendments of the United States Constitution, along with injunctive relief barring its enforcement. (*Id.*) The parties have filed cross motions for summary judgment. (Doc. Nos. 43, 46.) For the reasons discussed below, Plaintiffs' motion is granted, and the Township's motion is denied.

## I.    FACTUAL BACKGROUND

With a few minor exceptions noted below, the facts are largely undisputed.

### A.    The Thin Blue Line American Flag

This controversy centers around what the Court will refer to as the "Thin Blue Line American Flag" or the "Flag," an American flag that is in black and white except for a single blue horizontal stripe:



(Doc. No. 50 at ¶ 22.)

For Plaintiffs, the Flag "represents a show of support for [and] a solidarity with member[s] of law enforcement, which includes, police officers, represents the preservation of the rule of law, the protection of peace and freedom, the sacrifice of fallen law enforcement officers and the dedication of law enforcement office[r]s." (Doc. No. 50 at ¶ 23.) At a national level, the FOP has passed a resolution that affirms its "support for the use of the Thin Blue Line

[American] flag by law enforcement." (Doc. No. 50 at ¶ 24.)[3]  Likewise, the PBA, which is the collective bargaining unit for police officers employed by the Township (Wilbur Dep. at 23:18–20) and which represents members of the Springfield Township Police Department in "legal, legislative, and labor related matters" (Wilbur Decl. at ¶ 3), has incorporated the Thin Blue Line American Flag into its logo:



(Doc. No. 50 at ¶¶ 26–27.)  This logo appears on the PBA's website, http://stpbamontco.org/, on its merchandise, and at fundraisers and events hosted by the PBA, some of which take place on Township property.  (*Id.* at ¶¶ 28–29.)  For example, the PBA sponsors a Township little league and softball league, with its logo appearing on team uniforms and on a banner on the outfield wall.  (*Id.* at ¶ 33.)

The three individual Plaintiffs—Corporal Calhoun, Detective Baiada, and Sergeant Wilbur—are employed with the Township Police Department and are members of the PA FOP and the PBA.  (Doc. No. 1 at ¶¶ 3–5; Doc. No. 42 ¶¶ 3–5.)  The individual Plaintiffs and other members of the PBA display the Thin Blue Line American Flag in the police station, which is located in the main Township building.  (Baida Decl. at ¶ 4; Calhoun Decl. at ¶ 4; Wilbur Decl. at ¶ 9; Wilbur Dep. at 63:24; Doc. No. 50 at ¶ 31.)  Although there are no depictions of the Flag in the lobby area of the station (Doc. No. 47-1 at ¶ 80), it does appear in other areas of the

_____

[3] The PA FOP is the state lodge of the national organization.  (Regan Decl. at ¶ 2.)

station, to which the public has limited access (*id.* at ¶ 75), including:

- A bulletin board displaying patches from other police departments depicting the Thin Blue Line American Flag,

- A wooden Thin Blue Line American Flag hanging on a wall,

- A Thin Blue Line American Flag hanging on a wall,

- Thin Blue Line American Flags displayed in the safety office,

- A wooden "ballot type" box,

- On a recycling bin, and

- On challenge coins displayed on officers' desks.

(Doc. No. 50 at ¶ 32.)

Plaintiffs would like to continue to display the Thin Blue Line American Flag while on Township property.  (Baida Decl. at ¶ 7; Calhoun Decl. at ¶ 7; Wilbur Decl. at ¶¶ 11, 15.)  In addition to the depictions recited above, the individual Plaintiffs wish to display the Flag on other Township property, including on the flagpole at a pistol range in the Township and at the PBA table during community day.  (Doc. No. 50 at ¶ 34.  *But see* Doc. No. 50 at ¶ 35 (the Township denying this fact because "Plaintiffs have not cited to any specific request or intent by any Plaintiff to display the [Flag] on any Township property, with the exception of the flagpole at the pistol range.  Mr. Baiada specifically testified that he has no plans to affix the [flag] to any Township property").)

While Plaintiffs revere the Thin Blue Line American Flag, many members of the public, including residents of Springfield Township, view it as a symbol of police brutality and racial animosity.  (*See* Doc. No. 1-3.)  On September 13, 2021, three Township residents gave a presentation before the Township Board of Commissioners, which outlined a study that they had conducted on residents' opinions and concerns with the Township Police Department.  (Doc. No.

46-2 at ¶ 10; *see also* Doc. No. 46-4 (copy of presentation).  *But see* Doc. No. 47-1 at ¶¶ 10–19

(Plaintiffs objecting to any consideration of the survey, arguing that it is inadmissible hearsay

and was not included in the Township's Rule 26 disclosures).)  The presenters "key takeaways"

from the study were that "most participating residents are satisfied with the job [Township police

officers] are doing," but "[t]here are . . . important group (especially race/ethnicity and age)

differences," and "some commenters have concerns about racial bias."  (Doc. No. 46-4 at 52; *id.*

at 27 ("For police-initiated contact, White/Cauc residents reported more positive perceptions

(average = 3.7) than Black/AA residents (average = 3.2).")  After the presentation, then-

Commissioner Graham noted that African American residents had told him that they were

hesitant to report their concerns during the study for fear of retaliation by the Police

Department.[4]  (Doc. No. 47-1 at ¶ 19.  *But see id.* (Plaintiffs objecting to this statement as

inadmissible hearsay).)  The study, which was available to residents from March 5 to May 5,

2021, was conducted after the PBA adopted its new logo incorporating the Flag, but before the

logo was publicly displayed.  (*See* Doc. No. 47-1 at ¶ 38; Wilbur Dep. at 25:8–26:22 (testifying

initially that the "first time that logo was publicly displayed . . . would have been in 2020" but

then correcting to say that "the first sort of public display of that logo was in the banner for the

car show" in fall 2021).)

　　　After the September presentation, several Township commissioners met with several

members of the PBA to discuss the PBA's decision to incorporate the Flag into their logo.  (Doc.

No. 47-1 at ¶¶ 52–54.)  At the end of the meeting, the commissioners asked the PBA to change

its logo.  (*Id.* at ¶ 55.)  The PBA ultimately voted to deny the request.  (*Id.* at ¶ 56.)

---

[4] Graham resigned from the Board of Commissioners on March 6, 2023, and the resignation was approved on April 12, 2023.  (Doc. No. 47-1 at 4–5.)

Over the next year, tensions grew between the Board of Commissioners and the PBA over the PBA's use of the Thin Blue Line American Flag.  In 2022, several Township residents contacted both the PBA and the Township with concerns about the PBA's logo.  (Doc. No. 47-1 at ¶ 57.  *But see id.* at ¶¶ 57, 58, 59 (admitting to this general proposition but objecting to the Township's introduction of specific emails reflecting residents' comments as inadmissible hearsay).)  The Township offered to cover the cost of the PBA changing its logo, informing the PBA that the Township had arranged for a private donor to pay up to $10,000 for that purpose.  (*Id.* at ¶¶ 67–68.)  But the PBA again voted not to change the logo.  (*Id.* at ¶ 69.)

On October 26, 2022, Township Solicitor James Garrity, and Township Manager A. Michael Taylor, sent a cease-and-desist letter to the PBA about its use of the Flag.  (*See* Doc. No. 1-3; *see also* Doc. No. 47-1 at 70.)  In that letter, Solicitor Garrity and Manager Taylor explained that many Township residents have "express[ed] deep discontent and distrust of the PBA and even the Township's own police department, due to PBA's use of the flag which has become known as the 'Blue Lives Matter Flag.'"  (Doc. No. 1-3 at 1.)  They emphasized that the Flag "has been at the center of the controversy between minority communities and law enforcement officials across the country," citing the "usurpation and display" of the flag by white nationalists.  (Doc. No. 1-3 at 1.)  Thus, they reasoned, "regardless of the history or original intent of the PBA in displaying" the Flag, "[t]o many members of the Springfield Township community, the utilization of the 'Blue Lives Matter' Flag unnecessarily exacerbates the ongoing conflict between police officers and the communities they serve."  (*Id.* at 2–3.)  The letter ends by directing the PBA and its members to discontinue all depictions of the Flag or have the PBA remove the words "Springfield Township" from its name.  (*Id.* at 2.)

A few months later, in December 2022, the Township Board of Commissioners

considered Resolution 1587, which would have authorized Solicitor Garrity to file a lawsuit to compel the PBA to remove any reference to "Springfield Township" from its logo. (*See* Doc. No. 50 at ¶ 37.) Although Resolution 1587 was placed on the agenda for the December 14, 2022 meeting of the Board of Commissioners, the Board never voted on that resolution. (*Id.*)

**B.    Resolution 1592**

When the PBA refused to change its logo or its name, the Springfield Township Board of Commissioners drafted Resolution 1592, which purports to ban depictions of the Thin Blue Line American Flag. It reads:

> [T]he Board of Commissioners of Springfield Township does, as a matter of respect and sensitivity to all the citizens of the Township, hereby prohibit the publicly visible display or use of any image which depicts the Thin Blue Line American Flag symbol by any Township employee, agent, or consultant and in an effort to be clear and as reasonably limited as possible, specifically prohibits the following:
>
> 1)  The publicly visible depiction of the symbol on the clothing or skin of any Township employee, agent or consultant while on duty, during the workday of the individual or while representing the Township in any way (specifically including the off duty time of any such individual if still wearing the Township uniform). ["Section One"]
>
> 2)  The publicly visible depiction of the Thin Blue Line American [F]lag symbol on any personal property of a [T]ownship employee, agent, or consultant, which is brought into the [T]ownship building (except prior to or subsequent to reporting for duty or any official assignment for the Township), and which, in the reasonable opinion of the Township Manager, is placed in a location likely to be seen by a member of the public while visiting the [T]ownship building. ["Section Two"]
>
> 3)  The display, by installation or affixation of a publicly visible depiction of the symbol, on [T]ownship owned property (including [T]ownship vehicles), by any person. ["Section Three"]

(Doc. No. 1-5 at 1–2.)  The Resolution was adopted on January 11, 2023.  (Doc. No. 50 at ¶ 38; *see also* https://www.springfieldmontco.org/government/meeting-agendas-minutes/ ("Video of Jan. 11 Bd. Meeting").)  Five days later, Manager Taylor circulated a memorandum to all Township employees, including the individual Plaintiffs, about Resolution 1592, emphasizing that it was "effective immediately" and that all employees with "any personal property with the [Thin Blue Line American Flag] symbol on it . . . located in such a place where it is likely to be seen by a member of the public," were to "remove it from the premises, or relocate it to a place where it is not likely to be seen by a member of the public while visiting the township building." (Doc. No. 1-6; *see also* Doc. No. 50 at ¶ 44.)  The Township concedes that this directive is enforceable against Township employees.  (Doc. No. 50 at ¶ 46; *see also* Apr. 3, 2023 Oral Arg. Tr. at 49:11–14.)    The Court will refer to this directive as the "January Memorandum."

Given Resolution 1592 and the January Memorandum, the individual Plaintiffs and other members of the Police Department, almost all of whom are members of the PBA, fear the Township will take punitive action against them if they continue to display or depict the Thin Blue Line American Flag.  (Baida Decl. at ¶ 9; Calhoun Decl. at ¶ 9; Wilbur Decl. at ¶ 18.  *But see* Doc. No. 50 at ¶ 50 (denying this fact because "Mr. Baiada specifically testified that he has no plans to affix the [flag] to any Township property").)  The individual Plaintiffs have specifically attested that they will "self-censor and not exercise their First Amendment rights for fear of disciplinary action," if Resolution 1592 is allowed to go into effect.  (Wilbur Supp. Decl. at ¶¶ 3–4; Baiada Supp. Decl. at ¶ 3; Calhoun Supp. Decl. at ¶ 3.  *But see* Doc. No. 50 at ¶ 51 (denying this fact because "Mr. Baiada specifically testified that he has no plans to affix the [flag] to any Township property" and because "Plaintiffs admitted at their depositions that no one at the Township has ever told Plaintiffs that they cannot display the traditional thin blue line

flag.").)

## II.   PROCEDURAL HISTORY

On January 27, 2023, a little over two weeks after the Board adopted Resolution 1592,

the Organizations and individual Plaintiffs filed this action, along with a motion seeking a TRO

and preliminary injunction.  (*See* Doc. Nos. 1, 2.)  That afternoon, the Court held a telephone

conference with counsel for Plaintiffs and Solicitor Garrity.  (*See* Doc. No. 4.)  During that

conference, Mr. Garrity represented that the Township would not enforce the Resolution pending

the Court's ruling on the motion for preliminary injunction.  Because this representation

eliminated the risk of imminent injury to Plaintiffs, the Court denied as moot Plaintiffs' request

for a TRO.  (Doc. No. 5.)  The Court simultaneously scheduled an evidentiary hearing and oral

argument on the request for a preliminary injunction.  (*Id.*)

Before that argument occurred, however, the parties stipulated that the Township would

continue to refrain from enforcing Resolution 1592 until further order from the Court.  (Doc. No.

8.)  Accordingly, the Court also denied as moot the motion for preliminary injunction and

entered a scheduling order, which included dates for dispositive motions and oral argument on

the constitutionality of Resolution 1592 and the appropriateness of a permanent injunction.

(Doc. No. 9.)  Not long after beginning discovery, the Township moved to dismiss the

Organizations under Federal Rule of Civil Procedure 12(b)(1) for lack of standing.  (Doc. No.

22.)[5]  The Court denied that motion, finding that the PBA has associational standing to challenge

---

[5] The Township simultaneously moved under Rule 12(b)(6) to dismiss the individual Plaintiffs'
challenge to Section Two of the Resolution, arguing that any challenge to that Section fails as a matter of
law.  (Doc. No. 22 at 22–26.)  The Court denied the motion at that stage because the Township previously
asked the Court to reserve argument on the constitutionality of the Resolution until summary judgment.
(*See* Doc. No. 21 (scheduling order entered after a pretrial conference in which the Township asked the
Court to delay ruling on the appropriateness of an injunction until after the Township had an opportunity
to conduct discovery).)

the Resolution and that the Court need not decide whether PA FOP also had standing under the one plaintiff rule.  (Doc. No. 40.)

One discovery dispute is worth mentioning.  Not long after the Township filed its motion to dismiss, Plaintiffs moved for a protective order limiting the scope of discovery requests served on them by the Township.  (*See* Doc. No. 25.)  Plaintiffs argued that the discovery requests sought privileged and irrelevant information.  (*Id.*)  In ruling on those issues, the Court necessarily considered the First Amendment tests that govern this litigation.  (*See* Doc. No. 34.)  At that stage, Plaintiffs argued that the constitutionality of the Resolution is governed by the Supreme Court's opinion in *United States v. National Treasurers Employees Union ("NTEU")*, while the Township argued that the balancing test outlined by the Supreme Court in *Pickering v. Board of Education* should control.  (*See id.* at 18.)  The Court agreed with Plaintiffs, provided a thorough and lengthy analysis on this issue, and granted the motion for a protective order.  (*See id.* at 22–30, 34.)

III.   **LEGAL STANDARD**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not [themselves] to weigh the evidence and determine the truth of the matter

but to determine whether there is a genuine issue for trial." *Id.* at 249.  And at "summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008); *see also Manetas v. Int'l Petroleum Carriers, Inc.*, 541 F.2d 408, 413 (3d Cir. 1976) ("It is well settled that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.").  "Courts are permitted to resolve cross-motions for summary judgment concurrently," but "[w]hen doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018).

## IV.    EVIDENTIARY ISSUES

Before turning to the substantive issues, the Court must first address four evidentiary challenges raised by Plaintiffs.  Although the facts are largely undisputed, Plaintiffs do challenge the extent to which the Court can consider:  (1) the presentation shown to the Board of Commissioners in September 2021, (2) former-Commissioner Graham's statements about residents' concerns, (3) emails showing that residents object to the PBA's use of the Flag in its logo; and (4) the results of a 2020 "Right to Know Request," which suggest the Police Department stops and arrests a disproportionate number of persons who identify as African American.  The Court addresses each category in turn.

### A.    The Presentation

First, Plaintiffs object to the admission of a presentation given to the Board of

Commissioners in September 2021, which discussed residents' opinions on the Township Police Department.  (Doc. No. 47 at 2–3.)  Plaintiffs argue that the Court cannot consider the presentation because the Township failed to identify the presenters or the presentation in its initial disclosures, and in any event, the presentation is inadmissible double hearsay.  (*Id.*)[6]

### 1.    Initial Disclosures

Plaintiffs argue that the Court should exclude the presentation from consideration because the Township did not identify the presentation or the presenters in its Rule 26 initial disclosures.  (Doc. No. 47 at 3.)  Federal Rule of Civil Procedure 26 states that a party's initial disclosures "must" include "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  In addition, the disclosures "must" provide "a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  Finally, when a party "learns that in some material respect the disclosure or response is incomplete or incorrect," and "the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," that party "must supplement or correct its disclosures."  Fed. R. Civ. P. 26(e)(1)(A); *Holley v. Port Auth. of N.Y.*, Civil No. 14-7534 (BRM)(DEA), 2018 WL 11413338, at *2 (D.N.J. May 3, 2018) ("[T]he parties are required to

---

[6] Plaintiffs also argue that the Township failed to identify or produce the presentation in response to Plaintiffs' written discovery requests.  (Doc. No. 47 at 3.)  But they provide no discussion as to why this failure warrants exclusion.  (*See id.*)

supplement or correct their initial disclosures, as well as any discovery responses, in accordance with Fed. R. Civ. P. 26(e)(1)(A).").

Plaintiffs argue that the Township failed to update its disclosures as required by Rule 26(e) despite knowing about the presentation since September 2021.  (Doc. No. 47 at 4.) Plaintiffs also argue that they are harmed by the failure because by "springing the documents on plaintiffs through a motion for summary judgment, the Township has denied Plaintiffs the opportunity to take discovery on a cornerstone of the Township's defense."  (*Id.*)  The Township responds that although it failed to reference the researchers or the presentation in its initial disclosures, the failure was harmless because the presentation's existence is not a surprise to Plaintiffs.  (Doc. No. 56 at 1–2.)  Notably, defense counsel learned of the presentation because it was linked in an email produced *by Plaintiffs*, and the presentation was used as an exhibit in multiple depositions.  (*Id.*)

The Court finds that the Township did not need to formally revise its initial disclosures because the names of the presenters and the presentation were "otherwise . . . made known" to Plaintiffs through discovery.  *See* Fed. R. Civ. P. 26(e)(1)(A); *Eli Lilly & Co.*, 2010 WL 1849913, at *3 ("In the event disclosures become incomplete or incorrect, the party *must* correct its disclosures—formally—unless the corrective information has 'otherwise been made known.'" (quoting Fed. R. Civ. P. 26(e)).  Although Plaintiffs claim surprise, their argument is undermined by the fact that their own discovery responses identified the presentation, and defense counsel relied on the presentation during multiple depositions.  (*See* Doc. No. 56 at 11–15; Wilbur Dep. at 77:11–81:9; Baiada Dep. at 20:16–23:18.)  Indeed, the presentation's use during depositions suggests Plaintiffs both knew about the presentation *and* had an opportunity to probe its relevance in discovery.  *See McCowan v. City of Philadelphia*, 603 F. Supp. 3d 171, 187 (E.D.

Pa. 2022) ("[E]ach witness was identified and discussed throughout discovery, such that Plaintiffs should have known that they have information relevant to McCowan's transfer and the investigation into her complaint.  In other words, each witness was 'made known' to Plaintiffs, such that the City was not obligated to update its initial disclosures."); *see also Eli Lilly & Co.*, 2010 WL 1849913, at *3 ("A majority of courts, the leading treatises, and the Advisory Committee Note to Rule 26 agree that an individual's existence or knowledge can 'otherwise be made known,' and thus be sufficiently disclosed for Rule 26 purposes, through deposition testimony.").

### 2.    <u>Hearsay</u>

In the alternative, Plaintiffs argue that the presentation is inadmissible hearsay.  "Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009).  This rule applies equally to statements that represent double hearsay.  *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").  Here, the presentation is double hearsay because the Township is relying on a presentation given to the Board of Commissioners (the first level of hearsay), which contains anonymous statements that residents made to researchers (second level).  *Cf. Giuliani v. Springfield Township*, 238 F. Supp. 3d 670, 691 n.9 (E.D. Pa. 2017) ("[T]his evidence is double hearsay as plaintiffs are relying on statements made by individuals to a newspaper reported and then published in an article.").

The Federal Rules of Evidence define "hearsay" as "a statement that:  (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Plaintiffs argue that the presentation "is emblematic of the hearsay problem" because the presentation included

"a series of anonymous out-of-court statements from residents."  (Doc. No. 47 at 3.)  The
Township responds that the presentation is definitionally "not hearsay," because it is not being
submitted to prove the truth of the matter asserted—i.e., how residents feel about the Police
Department—but instead, to show the effect the presentation had on the listener, the Township
Board of Commissioners.  (Doc. No. 56 at 3.)  *See United States v. Edwards*, 792 F.3d 355, 357
n.2 (3d Cir. 2015) ("To the extent Edwards was offering the statements made to him to explain
why he went to Bruce's motel room—that is, for the statements' effect on the listener—those
statements were not offered for their truth.  Therefore, they were admissible for a non-hearsay
purpose."); *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp.*, 609 F. App'x 669,
671 (2d Cir. 2015) (finding that hotel guests' survey responses were not hearsay "because those
responses were admitted solely for the purpose of showing their effect on HLT's decision to
terminate the franchising agreement").  But that only addresses one layer of hearsay—the
presentation that researchers gave to the Board.

The Township has not shown that *the residents' statements to researchers* are also
admissible under a hearsay exception or exclusion.  When asked about this layer at oral
argument, the Township argued that the Court could consider the underlying statements because
they were given anonymously as part of an "academic study."  But there is no "academic study"
exception to the rule against hearsay.  *See generally* Fed. R. Evid. 803. *See also Hixson v.
Houston Independent Sch. Dist.*, Civil Action No. 4:09–cv–3949, 2011 WL 3648104, at *18 n.10
(S.D. Tex. Aug. 17, 2011) ("Hixon attempts to rely upon newspaper articles and academic
studies of the TFA program as evidence that TFA candidates are younger and have lower health
care costs than individuals over 40.  HISD has challenged this evidence as hearsay.  We agree
with HISD that these documents are not competent summary judgment evidence.").  And even if

the Court broadly interprets defense counsel's argument as seeking admission under the residual hearsay exception, the Township has not shown that the *anonymous*[7] survey responses are "supported by sufficient guarantees of trustworthiness" or that the Township gave Plaintiffs "notice of the intent to offer the statement[s]—including [their] substance *and [each] declarant's name*." Fed. R. Evid. 807 (emphasis added).

Accordingly, Plaintiffs' objection to the presentation is sustained, and the Court does not consider it in deciding the motions for summary judgment.

### B.    Statements Made to Former-Commissioner Graham

Second, Plaintiffs challenge the admission of statements made by African American residents to former-Commissioner Graham about their reluctance to respond to the study discussed in the presentation for fear of retaliation by the Police Department.  (*See* Doc. No. 47-1 at ¶ 19.)  Plaintiffs argue that the statements are inadmissible hearsay.  (*Id.*)  Because the Township does not respond to this argument, the Court sustains the objection as uncontested. *See Bonsu v. Jackson Nat'l Life Ins. Co.*, Civil Action No. 1:05-CV-2444, 2010 WL 55714, at *2 n.4 (M.D. Pa. Jan. 4, 2010) ("JNL has not attempted to justify admission of these statements under hearsay rules, and the court will therefore not accept them for their truth" in deciding the motion for summary judgment.).  The Court will not consider former-Commissioner Graham's

---

[7] During oral argument, defense counsel implied that the anonymous nature of the survey responses rendered them more trustworthy.  *See United States v. Pringle*, 57 F.3d 1073 (Table), *3 (7th Cir. 1995) ("Defendant claims that the district court abused its discretion in ruling that the hearsay statement from the unknown fireman to the newspaper reporter was inadmissable. Defendant contends that the statement was admissible under Rule 804(b)(5)'s residual hearsay exception. The district court did not abuse its discretion.  Defendant has failed to establish equivalent circumstantial guarantees of trustworthiness to those offered by various specific hearsay exceptions.  Moreover, if the statement is true and the firemen recovered and removed weapons from the burning truck, the defendant could have procured through reasonable efforts more probative evidence of that fact than anonymous hearsay. (cleaned up)); *cf. Miller v. Keating*, 754 F.2d 507, 510–11 (3d Cir. 1985) (discussing how the anonymity of the declarant made it difficult to show sufficient guaranty of trustworthiness under excited utterance exception to hearsay rule).

statements in deciding the current motions for summary judgment.

### C.      Emails to the PBA

Third, Plaintiffs argue that the Court cannot consider emails that Township residents submitted to the PBA complaining about the PBA's use of the Flag because the emails are inadmissible hearsay.  (Doc. No. 47-1 at ¶¶ 58–66; *see also* Doc. No. 46-11 (collecting emails).) The Township argues that, like the presentation, the emails are admissible to show their effect on the Board of Commissioners.  (Doc. No. 56 at 3.)  The Court agrees that any emails that were also sent *to the Board of Commissioners* are admissible for the limited purpose of showing their effect on the commissioners' decision to pass Resolution 1592.  (*See* Doc. No. 46-11 at 6–11 (email from Erin McCrossan to Christian Wilbur that copied the Board of Commissioners and Manager Taylor).)  The Township has not, however, shown that before this litigation, the commissioners saw the email complaints that were sent *only to the PBA* about its logo.  And since Defendants have not presented another non-hearsay use for this evidence, those emails meet the definition of hearsay.  *See* Fed. R. Evid. 801(c).

Accordingly, Plaintiffs' objections to the emails are sustained in part, and the Court will not consider the emails sent only to the PBA in deciding the current motions for summary judgment.

### D.      Responses to 2020 Request Under Pennsylvania Right to Know Law

Last, Plaintiffs argue that the Court should ignore the results of a 2020 request under Pennsylvania's Right to Know Law ("RTKL"), which show that despite only 8.9% of the Township population being African American, 34.31% of all traffic contacts by the Springfield Township Police Department involved African American drivers and 48.62% of all individuals arrested by the Department were African American.  (*See* Doc. No. 47-1 at ¶¶ 22–23.)  Plaintiffs argue that the Township failed to identify those results in its initial disclosures or in response to

Plaintiffs' discovery requests.  (Doc. No. 47 at 2–3.)  The Township does not respond to this argument or justify its reliance on the results, so Plaintiffs' objection is sustained as uncontested. *Cf. Bonsu*, 2010 WL 55714, at *2 n.4.  The Court will not consider those results in deciding the current motions for summary judgment.

*      *      *

In sum, the Court overrules Plaintiffs' objections to the extent they challenge an email chain complaining about the PBA's logo, which was sent to the PBA and the commissioners. That chain may be considered for the effect it had on the Board of Commissioner's decision to pass Resolution 1592.  Plaintiffs' objections to the admission of the presentation, email complaints sent only to the PBA, statements made to former-Commissioner Graham related to the survey, and the 2020 RTKL results are sustained.  The Court will not consider those documents in deciding the motions for summary judgment.

## V.    PLAINTIFFS' STANDING

Having clarified the scope of the record, the Court turns to the Township's renewed argument regarding the Organizations' standing to challenge the Resolution.  The Township argues that the PA FOP and PBA "lack independent standing to challenge Section 3 of the Resolution."  (Doc. No. 46-1 at 6.)[8]  Plaintiffs respond that the Organizations have associational standing to challenge the Resolution in its entirety on behalf of their members.  (Doc. No. 45 at 23.)

As the Court explained in its prior Memorandum denying the Township's motion to dismiss (Doc. No. 40 at 8), an organization has associational standing when: "[1] its members

---

[8] As before, the Township does not dispute the individual Plaintiffs' standing to challenge the Resolution.

would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977).[9]  As before, the parties' dispute centers on whether and to what extent the Organizations' individual members have standing.  An individual has standing when he or she satisfies the "irreducible constitutional minimum of standing." *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 152 (3d Cir. 1999) (quoting *Lujan*, 504 U.S. 560). This requirement has three parts:  (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) "a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (quoting *Lujan*, 504 U.S. at 560).  Again, the Township's challenge is limited to the first element:  the extent to which the PBA's members can show an injury-in-fact.  The Township argues that the members' standing is limited to the prohibitions included in the January Memorandum.  (Doc. No. 46-1 at 8.)  The Township reasons that because the Resolution is not independently enforceable,[10] the individual Plaintiffs cannot challenge it directly, and instead, can challenge only the January Memorandum, which limits the Resolution's application

---

[9] "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Therefore, although the Court previously found the Organizations had alleged sufficient facts to survive a motion to dismiss for lack of standing, we must now evaluate whether they have put forth sufficient evidence to survive a motion for summary judgment for lack of standing.

[10] Throughout this litigation, the Township has maintained that the Resolution is not independently enforceable as a matter of Pennsylvania law.  (See, e.g., Doc. No. 46-1 at 3 (distinguishing a resolution from an ordinance).)  As this Court previously explained, *see Pa. State Lodge Fraternal Order of Police v. Township of Springfield*, __ F. Supp. 3d __, Civil Action No. 23-332-KSM, 2023 WL 4216095, at *6 (E.D. Pa. June 27, 2023), and as the Court reiterates below, this distinction is largely immaterial in this case because the Township maintains that the January Memorandum renders the Resolution enforceable against employees, agents, and consultants (*see* Apr. 3, 2023 Oral Arg. Tr. at 49:11–14; Doc. No. 46-1 at 3).

to employees, agents, and consultants and which requires compliance only with Sections One, Two, and Three of the Resolution.  (*Id.*)  This argument misunderstands the nature of the injury in fact inquiry and misreads the January Memorandum.

For the injury in fact requirement, the Court considers whether the PBA's members have, as a result of the Resolution, suffered an injury that is both "concrete and particularized" and "actual or imminent."  *Susan B. Anthony List*, 573 U.S. at 157–58 (quoting *Lujan*, 504 U.S. at 560).  In the context of a pre-enforcement challenge to a statute limiting speech, "the threatened enforcement of a law" itself can rise to the level of an Article III injury, and the individual "subject to such a threat" need not suffer "an actual arrest, prosecution, or other enforcement action" as a "prerequisite to challenging the law."  *Id.* at 158; *see also Babbitt*, 442 U.S. at 298 ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." (quotation marks omitted)).  Instead, an individual "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statue, and there exists a credible threat of prosecution thereunder.'"  *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298); *see also Laird v. Tatum*, 408 U.S. 1, 11 (1972) ("In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. . . .  [I]n each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.").

Here, the PBA has shown that its members, almost all of whom are employed by the

Township Police Department, have displayed, and wish to continue displaying, the Thin Blue Line American Flag while on and off duty, on Township property and on their personal property. (Baida Decl. at ¶¶ 4–7; Calhoun Decl. at ¶¶ 4–7; Wilbur Decl. at ¶¶ 9–15.)  This conduct is proscribed by Resolution 1592, which "prohibit[s] the publicly visible display or use of any image which depicts the Thin Blue Line American Flag symbol by any Township employee, agent, or consultant[.]"  (Doc. No. 1-5 at 1.)[11]  Finally, there is a "credible threat" of enforcement of the Resolution's prohibition because the January Memorandum renders the Resolution enforceable as against Township employees, including members of the Police Department. (Doc. No. 1-6; Doc. No. 50 at ¶ 44; *see also* Apr. 3, 2023 Oral Arg. Tr. at 49:11–14 (defense counsel conceding that the Resolution is enforceable against employees).)

Contrary to the Township's assertion, the fact that the January Memorandum renders the Resolution enforceable does not mean that as a matter of law, the PBA's members are limited to challenging that memorandum.  And even if it did, as a factual matter, the text of the January Memorandum does not purport to limit or alter the Resolution's prohibitions.  Instead, it includes the Resolution as an attachment and states it is "effective immediately," suggesting the

---

[11] The Court addresses the parties' conflicting interpretations of the Resolution in the next section of this Memorandum.  In short, Plaintiffs view the Resolution as including a single broad prohibition followed by three examples of the type of conduct proscribed.  The Township, by contrast, views the Resolution as prohibiting three separate categories of conduct.  The Court agrees with Plaintiffs, but even if we were to adopt the Township's reading, that would not alter the Court's conclusion that Plaintiffs, who bring an overbreadth challenge, have standing to challenge the entire Resolution and not one subsection of it.  *See McCauley v. Univ. of V.I.*, 618 F.3d 232, 238 (3d Cir. 2010) ("McCauley obviously has standing to challenge Paragraph E, as UVI charged him with violating that paragraph.  The other paragraphs, however, require closer examination.  Litigants asserting facial challenges involving overbreadth under the First Amendment have standing where their own rights of free expression are not violated because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression. . . .  Despite McCauley's trial testimony that he suffered no deprivations of Paragraphs B, H, and R, we conclude that he has standing to challenge those paragraphs," all of which "have the potential to chill protected speech." (cleaned up)).

Resolution, in its entirety, is enforceable against Township employees, agents, and consultants. (Doc. No. 1-6.)  The January Memorandum's explicit reference to Sections One, Two, and Three of the Resolution does not undermine this conclusion, particularly when nothing in the Memorandum suggests it is limiting the Resolution's enforcement solely to those subparts.  (*See id.*)

In sum, the PBA's members, including the individual Plaintiffs have standing in their own right to challenge Resolution 1592, and thus the PBA has associational standing to challenge the Resolution on behalf of those members.  Because the PBA and individual Plaintiffs have standing to challenge the Resolution, the Court need not decide whether the PA FOP also has standing.  *See Bd. of Educ. v. Earls*, 536 U.S. 822, 826 n.1 (2002) ("Because we are likewise satisfied that Earls has standing, we need not address whether James also has standing."); *Seigel v. Platkin*, __F.Supp.3d__, Civil No. 22-7464 (RMB/AMD), 2023 WL 1103676, at *6 (D.N.J. Jan. 30, 2023) ("[O]nce one plaintiff is found to have standing as to a claim, the Court need not inquire as to the standing of other plaintiffs on that claim for purposes of the Motion." (citations omitted)).

## VI.      STATUTORY CONSTRUCTION

Having found that Plaintiffs have standing to bring this suit, the Court turns to the text of Resolution 1592.  The parties dispute the scope and meaning of the Resolution's text.  Plaintiffs argue that the Resolution presents a single, broad prohibition, and that Sections One, Two, and Three are illustrative, not exhaustive, of the conduct encompassed by that prohibition.  (Doc. No. 45 at 14.)  The Township, on the other hand, suggests the text of the Resolution is immaterial because the Resolution is only enforceable through the January Memorandum, which the Township interprets as requiring employees to "comply with the three (3) provisions referenced in the Resolution."  (Doc. No. 46-1 at 8; *see also, e.g.*, *id.* at 13 (addressing the "three (3) areas

of limitation from the January 16, 2023, Memorandum" under the *NTEU* test); Doc. No. 56 at 4–5.)  The Plaintiffs have the better argument.  The Court must focus on the text of the *Resolution* because that is the governmental conduct that Plaintiffs challenge.

Looking to that language, the Resolution "prohibit[s] the publicly visible display or use of any image which depicts the Thin Blue Line American Flag symbol by any Township employee, agent, or consultant and in an effort to be clear and as reasonably limited as possible, specifically prohibits" the three categories of speech outlined in Sections One, Two, and Three.

> [Section One:]  The publicly visible depiction of the symbol on the clothing or skin of any Township employee, agent or consultant while on duty, during the workday of the individual or while representing the Township in any way (specifically including the off duty time of any such individual if still wearing the Township uniform).
>
> [Section Two:]  The publicly visible depiction of the Thin Blue Line American [F]lag symbol on any personal property of a [T]ownship employee, agent, or consultant, which is brought into the [T]ownship building (except prior to or subsequent to reporting for duty or any official assignment for the Township), and which, in the reasonable opinion of the Township Manager, is placed in a location likely to be seen by a member of the public while visiting the [T]ownship building.
>
> [Section Three:]   The display, by installation or affixation of a publicly visible depiction of the symbol, on [T]ownship owned property (including [T]ownship vehicles), by any person.

(Doc. No. 1-5 at 1–2.)

Throughout this litigation, the Township has suggested that Resolution 1592 prohibits only the three categories of speech included in the three subsections.  But that interpretation would have us ignore the general prohibition that begins the Resolution, which we will not do. *Cf. TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v.*

*Walker*, 533 U.S. 167, 174 (2001)); *McMunn v. Babcock & Wilcox Pwr. Gen. Grp.*, 131 F. Supp. 3d 352, 388 (W.D. Pa. 2015) ("There is no reason to believe this principle [of statutory construction] does not apply equally to regulations.").  Instead, the more appropriate interpretation is to view the Resolution as broadly "prohibit[ting] the publicly visible display or use of any image which depicts the Thin Blue Line American Flag symbol by any Township employee, agent or consultant," including the three types of conduct outlined in the sections that follow.[12]  Section Three's reference to "any person" does not undermine that conclusion, nor is the phrase "any person" rendered superfluous by the Court's interpretation of the general prohibition beginning the Resolution.  As written, it is plausible to interpret "any person," as any person who is also a Township "employee, agent, or consultant."  *Cf. United States v. Yung*, 37 F.4th 70, 79 (3d Cir. 2022) ("To decide between the broad and narrow readings, we use ordinary tools of statutory interpretation.  Here, those tools support the broad reading of the statute.  Even so, the narrow reading is textually plausible.  Because that definition will not twist the text beyond what it will bear, we must adopt it . . . to avoid the strong medicine of invalidating the statute as facially overbroad." (quotation marks omitted)).

With this understanding of the Resolution's text in mind, the Court turns to Plaintiffs' claims that the Resolution is unconstitutional under the First Amendment.

---

[12] Because the Court interprets the Resolution such that the three subsections are illustrative of the broad prohibition, we need not address the Township's interpretation of those sections.  Nevertheless, we note that the Township's reading of those sections is often at odds with the text of the Resolution.  For example, the Township suggests Section One regulates only police uniforms.  (Doc. No. 46-1 (arguing that "the only issue before the Court" under this section "is whether the Township may restrict police officers from wearing an acknowledged hate symbol as part of their official police uniform").)  But by its terms, that section applies to "Township employee[s], agent[s, and] consultant[s]," not just police officers.  (Doc. No. 1-5 at 1–2.)  In addition, Section One forbids any publicly visible depiction of the Flag on "clothing or skin," not just uniforms, and applies "while [they are] representing the Township in any way," not simply when they are on duty and in uniform.  (*Id.*)

## VII.     THE RESOLUTION'S CONSTITUTIONALITY

Plaintiffs argue that Resolution 1592 is an unconstitutional regulation of speech based on viewpoint and otherwise unconstitutional under multiple First Amendment doctrines.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "Viewpoint discrimination is . . . an egregious form of content discrimination," and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Id.* at 828–29. For that reason, the Supreme Court has warned that the "government *must* abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829.

The Township has not, and indeed, cannot, contest that the Resolution is a viewpoint regulation—it prohibits employees, agents, and consultants from displaying *only* the Thin Blue Line American Flag, not from displaying flags or political speech generally. Instead, the Township argues that the Resolution is a permissible restriction on employee speech even though it targets a specific viewpoint. Given the Supreme Court's consistent assertion that viewpoint discrimination is inherently suspect, the Court questions whether the government can ever permissibly regulate employee speech based on viewpoint.[13] *See, e.g.*, *Rosenberger*, 515 U.S. at 828–29; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992) ("St. Paul's brief asserts that a

---

[13] One exception to this rule is when the government is speaking on its own behalf. *See Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015) ("When the government speaks, it is not barred by the Free Speech Clause from determining the content of what it says."); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (A "government entity has the right to 'speak for itself'" and "to select the views that it wants to express."); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Commissioner of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 618 (4th Cir. 2002) ("[E]ven ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message."). But the Township has not argued that Resolution 1592 regulates government speech.

general 'fighting words' law would not meet the city's needs because only a content-specific measure can communicate to minority groups that the 'group hatred' aspect of such speech 'is not condoned by the majority.'  The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content.") (citations omitted); *see also Ne. Pa. Freethought Society v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) ("[N]o matter what kind of property is at issue, viewpoint discrimination is out of bounds . . . .  Rather than aiming at an entire subject, it targets particular views taken by speakers.  And that violates the First Amendment's most basic promise.").

Just last year, the Third Circuit touched on this issue when it considered a decision by a municipality to prohibit its employees from wearing face masks with any political or social justice messaging.  *Amalgamated Transit Union Loc. 85*, 39 F.4th at 108–09.  The appellate court reiterated that "viewpoint-based government regulations on speech are nearly always presumptively suspect," and it emphasized that "public employers do not have a free hand to engage in viewpoint discrimination toward their employees."  *Id.; see also id.* at 107 ("[A]s Port Authority recognizes, it should not and cannot discriminate on the basis of viewpoint.").  The Third Circuit's holding, however, did not go so far as to set down a complete prohibition on viewpoint discrimination in the public employer context.  And in this case, we need not decide whether a government employer is always prohibited from imposing viewpoint restrictions, because regardless, the Resolution does not survive scrutiny as a permissible restriction on employee speech.

Because the parties disagree about which tests govern the Court's analysis of the Resolution, we begin with a discussion of the relevant precedent before applying that precedent to the undisputed facts.

A.    **Legal Framework**

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 474 (3d Cir. 2015) ("It is well accepted that a government has broader powers to regulate speech when it acts as an employer than when it acts as a sovereign."). Nevertheless, the Supreme Court has "made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti*, 547 U.S. at 417. A public employer has limited authority to regulate employee speech when "employees are speaking as citizens about matters of public concern." *Id*. at 419. In such instances, the government may restrict speech only to the extent necessary for it to "operate efficiently and effectively." *Id*. The Supreme Court first discussed this limitation in *Pickering v. Board of Education. See* 391 U.S. 563 (1968).

In *Pickering*, the local board of education dismissed a teacher after he submitted a letter to a local newspaper that was critical about the board's allocation of school funds between academic and athletic programs and about the board's reasons for seeking additional tax revenue. *Id*. at 569–70. In finding the teacher's dismissal improper, the Court held that "absent proof of false statements, knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id*. at 574. To determine whether the dismissal passed constitutional muster, the Court weighed "(1) the interest of the employee, 'as a citizen, in commenting upon matters of public concern,' against (2) 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Amalgamated Transit Union Loc. 85*, 39 F.4th at 104 (quoting *Pickering*, 391 U.S. at 568).

Almost 30 years after *Pickering*, the Supreme Court drew a distinction between pre-

enforcement challenges to regulations of employee speech and post-enforcement challenges after an employee is disciplined for a specific statement. *See NTEU*, 513 U.S. at 454–55 ("[B]ecause § 501(b) constitutes a wholesale deterrent to a broad category of expression by a massive number of potential speakers, the Government's burden here is even greater than it was in *Pickering* and its progeny, which usually involved individual disciplinary actions taken in response to particular government employees' actual speech."). When the government imposes a "statutory restriction on [employee] expression," it "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation' of the Government." *Id*. at 468.

This Court previously rejected the Township's suggestion that *Pickering*, not *NTEU*, governs this action. *See Fraternal Order of Police Pa. Lodge*, 2023 WL 2839093, at *11–13. In its summary judgment briefing, the Township begrudgingly acknowledges that *NTEU* controls. (*See* Doc. No. 46-1 at 8 (arguing that "the Court must engage in the balancing test set forth in *Pickering* . . . as modified by [*NTEU*]").) Nevertheless, it continues to rely on *Pickering* and its progeny. For example, the Township argues that this Court is bound by the Third Circuit's opinion from earlier this year in *Fenico v. City of Philadelphia.* (*Id.* at 9–11.) But *Fenico* involved a post-enforcement challenge à la *Pickering*, not a pre-enforcement challenge like the one we consider here. A brief discussion of *Fenico*'s holding is helpful for understanding why the Township's reliance on that case fails.

In *Fenico*, a dozen police officers brought First Amendment retaliation claims against the City of Philadelphia after the City "took disciplinary action against [them] for using Facebook to openly denigrate various minority groups and glorify the use of violence." 70 F.4th at 153. The

district court granted the City's motion to dismiss the First Amendment claims, finding that although the officers "spoke in their capacity as private citizens and some of their posts involve matters of public concern, the Officers fail[ed] to show that their right to free speech outweighs the government's interest in regulating that speech." *Id.* at 161 (cleaned up).  On appeal, the Third Circuit overruled that decision.

The appellate court began by explaining that to "plead a First Amendment retaliation claim, a government employee must allege," among other things, "that the activity is protected by the First Amendment." *Id.* at 162 (quotation marks omitted).  To show that the penalized speech is "protected speech," the employee must "establish that:  (1) in making it, they spoke as a private citizen, and (2) the statement involved a matter of public concern." *Id.*  If those elements are satisfied, the court "must then determine, under the test elaborated in *Pickering* . . ., if the employee's interest in speaking [on the matter of public concern] outweighs the government's interest in avoiding disruption of its operations." *Id.*

Before the district court, the City had "conceded that for purposes of their motion to dismiss, the [o]fficers spoke as private citizens and their speech involved matters of public concern."  The City also claimed on appeal that "this concession *arguendo* ends the public concern inquiry, reasoning that [the Third Circuit] need not consider whether the[ ] posts passed the public concern threshold, because they could not possibly succeed at *Pickering* balancing." *Id.* (cleaned up).  The Third Circuit rejected that argument, finding that the City "not only improperly propose[s] a threshold finding of nominal public concern as to all 250 posts without individualized analysis, but advocate[s] that such a finding is not even necessary in order to perform *Pickering* balancing." *Id.* at 162–63.  The court explained that precedent "require[d] a more nuanced understanding of both the precise public concern posed and the contours of the

government's interest before balancing the two" under *Pickering*. *Id.* at 163.  Emphasizing that the lawsuit "involve[d] twelve individual speakers who uttered 250 discrete statements covering a broad variety of controversial topics over a period of six or more years," the Third Circuit found that the "public concerns raised and potential disruption posed by these statements are simply too complex to adequately resolve *Pickering* balancing in the City's favor" at the motion to dismiss stage. *Id.*  Accordingly, it reversed the lower court's decision.

The Township argues that under *Fenico*, a district court applying *NTEU* must, as a preliminary issue, determine whether the speech restricted involves a matter of public concern, and in resolving that issue, the Court should use a "sliding scale" that analyzes whether "the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." (Doc. No. 46-1 at 9–10.)  The Court agrees that even under *NTEU*, the Court must consider whether the restriction targets speech on a matter of public concern, but we cannot agree that the Township's sliding scale approach is appropriate in a pre-enforcement challenge.  For one, the Township's argument, if accepted, would mean that a court had to perform the *Pickering* balancing test as a precursor to every *NTEU* claim.  *Fenico* does not support that conclusion.  To the contrary, *Fenico* chastised the district court and the City for classifying the public concern inquiry as a "threshold" issue instead of viewing it as a necessary part of the *Pickering* balancing test.  70 F.4th at 164 (acknowledging that the officers "adequately pled . . . that their speech was of some public concern" but nevertheless, declining to find that the issue was resolved such that the "case was ripe for *Pickering* balancing"); *id.* ("We do not purport to establish a specific minimum degree of particularity at which a court must evaluate the public concern raised by each plaintiff's speech in order to engage in fulsome *Pickering* balancing.").  In addition, *Fenico* suggests that a district court must engage in

"individualized analysis" of the public concern posed by each speech challenged before balancing. But such an individualized analysis is not conducive to the scope of the court's review under *NTEU*, where the court considers "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression." *NTEU*, 513 U.S. at 468; *see also Amalgamated Transit Union Loc. 85*, 39 F.4th at 105 ("In prior-restraint cases, we consider not just the speech that concerned the government, but all present and future expression that the rule may chill."). Accordingly, the Court rejects the Township's suggestion that *Fenico* governs the public concern analysis in this pre-enforcement case.

Instead, it is more appropriate to follow the holdings of other courts that considered the public value of speech in the pre-enforcement context. Instead of performing an "individualized analysis," those courts have considered the categories or types of speech that the government looks to regulate and analyzed whether those categories touch on matters of public concern. *See, e.g.*, *Swartzwelder v. McNeilly*, 297 F.3d 228, 238 (3d Cir. 2002) (applying *NTEU* and finding that "Order 53-7 restricts speech on matters of public concern" because the "principal aim of Order 53-7 appears to be testimony in court by Bureau employees, and we have held that court testimony, whether compelled or voluntary, is always a matter of public concern"); *Amalgamated Transit Union Loc. 85*, 39 F.4th at 110 ("Port Authority could still prohibit employee masks with messages that *categorically* fall outside the scope of First Amendment protection, such as messages that do not implicate matters of public concern." (emphasis added)).

### B.    Analysis

Applying *NTEU* and its progeny here, the Court has no trouble finding that Resolution 1592 regulates speech on a matter of public concern. The Resolution restricts the display of the Thin Blue Line American Flag, a symbol that reflects both a respect for fallen members of law enforcement and protests the Black Lives Matter movement. *See, e.g.*, *Fenico*, 70 F.4th at 165

("[E]ven the most deeply troubling speech may be of concern to the public and warrant First Amendment protection—depending on the facts of the case.  While it carries the potential to be inflammatory, speech touching on race relations is 'inherently of public concern.'" (quoting *Connick*, 461 U.S. at 151)); *Amalgamated Transit Union Loc. 85*, 39 F.4th at 103–04 ("Port Authority's mask rules restrict speech on matters of public concern.  'Black Lives Matter,' 'Thin Blue Line,' and anti-mask-mandate masks all comment on matters of political or social concern to the community that are subjects of legitimate news interest.") (cleaned up)).[14]

Having found the Resolution prohibits speech on a matter of public concern, the Court turns to the remaining *NTEU* factors.  Under *NTEU*, the government "bears the burden of showing that the necessary impact on the actual operation of the Government outweighs [the constitutional interest]" restricted by the Resolution.  To satisfy this requirement, the Township must show:  (1) it has identified a real, not conjectural, harm, and (2) the ban as applied addresses that harms in a direct and material way.  *Amalgamated Transit Union Loc. 85*, 39 F.4th at 105.  Plaintiffs argue that the Township has not satisfied either prong.  The Court agrees.

Under the first inquiry, the Township argues that it has a "real, not conjectural," concern that racial discord will impede the functioning of its police department.  (*See* Doc. No. 46-1 at 14 (asserting that the Township has a "very real and very serious concern that allowing the police

---

[14] The Township repeatedly suggests that the Thin Blue Line American Flag is of limited, if any, public value or concern because it is "offensive" and "racist."  (*See, e.g.*, Doc. No. 46-1 at 9, 15, 17, 19–20.)  But as this Court previously told the Township, "the First Amendment protects speech even when it is considered 'offensive.'"  *Fraternal Order of Police Pa. Lodge*, 2023 WL 2839093, at *11 n.7; *see also Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." (quotation marks omitted)); *United States v. Eichman*, 496 U.S. 310, 319 (1990) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (quotation marks omitted)).

department to display this symbol, not only through the PBA, but as part of the official uniforms, would present the appearance that the Township supported the racist message being projected by the [Flag]"); *id.* at 16 (asserting that the Resolution addresses the Township's concerns for instilling public confidence in the police department and lowering crime); *id.* at 17 (asserting that the Township has an "interest in promoting public trust in its police officers").)  Plaintiffs counter that the Township has put forth no evidence of a disruption caused by the display of the Flag, either in the workplace or between the Police Department and residents of the Township. (Doc. No. 45 at 31.)

The Township seems to concede that it has no evidence of workplace disruption caused by the display of the Flag.  (Doc. No. 49 at 7 (asserting that "workplace acrimony is irrelevant to the Township's motivation").)  Neither has it shown that the Flag has caused a "real" disruption to relations between the police and Township residents.[15]  The Township has pointed to complaints that a handful of residents made to it about the Flag.  (*See* Doc. No. 46-13.)  But even accepting those comments as evidence that the PBA's use of the Flag has caused some strain between residents and the Department, a handful of complaints does not transform the Township's concerns of wide-spread discord from the "conjectural" to the "real."  Particularly not when Manager Taylor testified that he was unaware of any disruptions in Township services because of the Flag.  (Township Dep. at 25:21–26:16.)

---

[15] The Township heavily relies on the September 2021 presentation as evidence of tension in police-resident relations, but as stated above, the Court cannot consider the presentation because it is inadmissible double hearsay.  Even if the presentation were admissible, it suggests only that some residents have reported concerns about potential racial tension with Township police officers.  The presentation does not connect those residents' views to the depiction of the Flag by the individual Plaintiffs or other members of the PBA.  In other words, the Township has not shown that *the display of the Flag* has led to an erosion in public trust of the police.  *See Amalgamated Transit Union Loc. 85*, 39 F.4th at 105 (finding that "masks bearing political and social-protest messages did cause controversy," as "[e]mployees engaged in heated arguments *about the views expressed on such masks*" (emphasis added)).

Second, even if the Township could show that it has a real concern that officers' decision to display the Flag will erode public confidence and trust in the Police Department and thus, result in an increase of crime in the future,[16] the Resolution does not address that harm in a direct and material way. *See Amalgamated Transit Union Loc. 85*, 39 F.4th at 106 (explaining that under the second step the government agency "must show that its policy is narrowly tailored to the 'real not merely conjectural' harm it identified"). Most obviously, the Resolution is not limited to the Township Police Department. Instead, it broadly applies to *all* Township "employees, agents, and consultants." *Cf. id.* (finding that the "Port Authority's uniform policy is overbroad" and therefore, not narrowly tailored, because it "sweeps in the wide array of social-issue and political speech in which Port Authority employees have long engaged without causing disruption"). "This breadth is especially suspect because the ban affects 'core' political speech, an area where fit must be particularly close." *Id.* Indeed, given that the Resolution prohibits political speech based on a particular *viewpoint*, its overbreadth is particularly egregious. *See id.* (explaining in the *NTEU* context that "if the ban had been viewpoint discriminatory, the government's burden of justification would have been even heavier"). Also problematic is the fact that the Resolution is not limited to displays of the Flag by Township employees while they are at work. The general prohibition at the beginning of the Resolution has no time or location limitations, and even if the Court focuses on the three subsections, Section One prohibits the Flag's display while an employee is off duty but representing the Township in *any way*.

In addition to being overbroad, the Resolution is underinclusive in that Township

---

[16] The Court in *Amalgamated* recognized that the "government need not show the existence of actual disruption if it establishes that disruption is likely occur because of the speech." 39 F.4th at 105 (noting that the "serious disruption caused by protests and riots following Pittsburgh's Black Lives Matter demonstrations justified Port Authority's concern that more severe disruption would likely follow mask-related controversy").

employees, including police officers, are allowed to engage in other forms of discourse that could exacerbate racial tensions and undermine public confidence in the Police Department.  For example, nothing in the Resolution precludes an officer, while on duty and in uniform, from voicing opposition to the Black Lives Matter movement or for example, carrying a coffee cup that says, "Blue Lives Matter."  Both forms of speech would seem to trigger the same concerns that the Township is trying to address through the Resolution, perhaps in an even more direct way.  *See id.* at 97 ("In other respects, Port Authority's policy is underinclusive.  Port Authority employees are permitted to engage in political speech in other ways, such as through oral or written communication.  That speech has the same, if not more, potential to cause disruption.").

In sum, even viewing the admissible evidence in the light most favorable to the Township, the Resolution is an unconstitutional restriction on employee speech under *NTEU*. Because the Court finds the entire Resolution unconstitutional on this ground, we need not reach Plaintiffs' vagueness and overbreadth arguments.  That said, the Court shares Plaintiffs' concerns that as phrased, it is likely difficult for Township employees and residents alike to know to whom the restrictions apply.  Similarly, it is unclear *where* the restrictions apply. The Resolution's broad prohibition lacks any location limitations, but at other times, the Resolution suggests it is limited to areas in the Township building, which, in the "reasonable opinion of the Township Manager" are "likely to be seen by a member of the public."  And even ignoring the inconsistencies, the Court is extremely skeptical of the Township's argument that the Resolution's vagueness is not unconstitutional because employees could simply ask the Township Manager his interpretation before displaying the Flag.

## VIII.   CONCLUSION

Resolution 1592 is an unconstitutional restriction on employee speech under the First

Amendment.  Plaintiffs' motion for summary judgment is granted.[17]  The Township's motion is denied.  An appropriate order follows.

---

[17] Plaintiffs also ask the Court to impose Rule 11 sanctions against the Township, arguing that the Township's motion is frivolous, raises arguments previously rejected by the Court, and "is riddled with statements that lack any evidentiary support, including repeated, vexatious assertions that plaintiffs are racist and desire to display racist hate symbol."  (Doc. No. 47 at 17.)  The Court declines to do so. Although some of the Township's arguments suggest it failed to read this Court's prior Memoranda, *see, e.g.*, *supra* Part VII.A, the arguments are not so egregious as to warrant sanctions.  As for the Township's repeated reference to the Thin Blue Line American flag and members of the PBA as "racist," the Court agrees that the Township's conduct at times borders on unprofessional.  And unfortunately, it appears that the morale of the police department, the same department that the Township previously acknowledged was "well-respected," has taken a significant toll from the repeated assertions that the police officers— and not merely the Flag—are racist.  Nevertheless, it is undeniable that *the Flag* carries racist undertones to certain members of the community.  Indeed, the individual Plaintiffs admitted that they have been told the Flag carries racial undertones.  (*See, e.g.*, Calhoun Dep. at 65:21–66:2, 79:5–9, 121:13–20, 124:13– 17; *cf.* Doc. No. 2-8 at 1 (stating in Resolution 1592's "whereas" clauses that "over time, and partially in negative response to the 'Black Lives Matter' flag, the Thin Blue Line American Flag has come to represent opposition to racial justice movements . . . and in some instances has become a symbol of white supremacy").)  Accordingly, the Court declines to sanction counsel on this ground as well.